OPINION
{¶ 1} Defendant-appellant, Ravon Ingram, appeals the judgment of the Franklin County Court of Common Pleas, whereby the trial court, pursuant to a jury trial, convicted appellant of one count of felonious assault with a firearm specification and one count of having a weapon while under disability.
 {¶ 2} The Franklin County Grand Jury indicted appellant on one count of: (1) attempted murder with firearm specifications, in violation of R.C. 2923.02, 2903.02, *Page 2 2941.141, and 2941.145; (2) felonious assault with firearm specifications, in violation of R.C. 2903.11, 2941.141, and 2941.145; and (3) having a weapon while under disability, in violation of R.C.2923.13. The charges stemmed from an April 7, 2006 shooting incident involving victim Mohammad Anwar and appellant's alleged accomplices Leslie R. Burney and juvenile B.H.
 {¶ 3} Appellant and Burney pled not guilty to the charges and their cases were tried together. Both parties filed motions to suppress testimony concerning, collectively: (1) Anwar's pre-trial identification of appellant and Burney; and (2) any in-court identification of appellant and Burney from Anwar. The trial court held a hearing on the motion.
 {¶ 4} At the suppression hearing, Columbus Police Detective Ronda Siniff testified to the following on behalf of plaintiff-appellee, the State of Ohio. On April 12, 2006, Detective Siniff interviewed Anwar about the April 7, 2006 shooting, and the detective showed Anwar two separate photo arrays with one containing Burney's photograph and the other containing appellant's photograph. Detective Siniff communicated with Anwar through an interpreter because Anwar did not speak English very well. The interpreter communicated with Anwar and Detective Siniff via the detective's cell phone. Ultimately, Anwar identified Burney and appellant from the photo arrays.
 {¶ 5} Appellee then played the video-recorded interview between Detective Siniff and Anwar. The recording depicted Anwar identifying Burney and appellant in the photo arrays as the individuals who shot him on April 7, 2006. *Page 3 
 {¶ 6} Anwar testified at the suppression hearing that he saw the two individuals who shot him on April 7, 2006, and that it was appellant and Burney who shot him. Moreover, at the suppression hearing, Anwar identified Burney and appellant, and Anwar confirmed that he identified Burney and appellant in the pre-trial photo arrays. Anwar also testified that another person hit him with a metal bar.
 {¶ 7} The trial court denied the suppression motions, and a jury trial ensued. Before the trial court administered oaths to the jury, the following exchange took place:
 MR. ZEYEN [appellee's counsel]: * * * It should be noted that [appellant] * * * has a weapons under disability count * * *. Before the jury is sworn, if they intend to try it separately to the court, that needs to be filed, and a jury waiver needs to be filed ahead of time.
 Do you intend to do that at this time?
 MR. SUTTON [appellant's counsel]: No, we will try it to the jury.
 MR. ZEYEN: Then we will introduce [appellant's] prior record as part of the element of that offense.
 MR. SUTTON: Maybe we will try it to the court.
(Tr. at 5.)
 {¶ 8} The trial court recessed court for appellant's counsel to make the appropriate filings. After the trial court readjourned, appellant's counsel stated that appellant desired to try the weapons under disability charge to the jury.
 {¶ 9} Thereafter, the parties entered the following stipulation in regards to appellant's weapons under disability charge: *Page 4 
 * * * The parties by stipulation agree that [appellant] was adjudicated a juvenile delinquent for the commission of an offense, that if committed by an adult, would have been any offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse, to-wit, on January 23rd, 2003, in the Court of Common Pleas, Franklin County Ohio, said [appellant] was convicted of possession of cocaine, a violation of Section 2925.11 of the Ohio Revised Code.
 Further, the stipulation is evidenced by * * * a certified copy of said conviction.
(Tr. at 234.)
 {¶ 10} In addition, the trial court, pursuant to appellee's motion, dismissed the one-year prison term firearm specifications that attached to the attempted murder and felonious assault charges. Thus, only the three-year prison term firearm specifications remained on the charges.
 {¶ 11} Subsequently, Columbus Police Officer Oscar Polta testified as follows on behalf of appellee. On April 7, 2006, someone had smashed the windows of a truck belonging to a worker at the Two Friends store. After the incident, Officer Polta arrived at the scene to investigate the incident, but no one was arrested for that incident.
 {¶ 12} Officer Polta returned to the Two Friends store after the shooting at issue in this appeal occurred. Officer Polta spoke with Anwar, who did not speak English well, and the officer learned that "the person that had smashed * * * the windows of the car out was [the] same person that shot him." (Tr. at 186.) The conversation lasted less than five minutes, and Officer Polta had other duties he needed to perform at the crime scene, such as securing the area and making sure the victim received medical attention. *Page 5 
 {¶ 13} On cross-examination, Officer Polta clarified:
 * * * I was led to believe by the victim that the person that had smashed out his truck window, who he had basically stated was [B.H.] was the one that had shot him.
(Tr. at 198.)
 {¶ 14} Detective Timothy Dorn testified as follows on behalf of appellee. On April 7, 2006, Detective Dorn interviewed Anwar at a hospital. Detective Dorn showed Anwar a photo array with B.H.'s photograph in it. Anwar identified B.H. as the individual that struck him with a metal bar during the April 7, 2006 shooting incident. Anwar did not indicate to Detective Dorn that B.H. shot him.
 {¶ 15} Detective Dorn further testified that the interview was in "broken English." (Tr. at 223.) However, according to Detective Dorn, Anwar seemed "calm" and "coherent" with "[n]o acute distress" at the hospital. (Tr. at 229-230.) However, Detective Dorn also testified that he would anticipate that somebody would have trouble communicating after just having been shot twice and beaten with a metal bar.
 {¶ 16} Next, Anwar testified at trial on behalf of appellee with the aid of a sworn interpreter. Anwar testified that he was working at the Two Friends store on April 7, 2006. Anwar stated:
 * * * Some small kid came in, and somebody hold the door from outside. And they open the door, but nobody came in. And I am looking at the door. The door is beeping and nobody is coming in. I try to close the door. And the guy standing, he hit me with the bar. And the other two shoot, the other two fired at me.
(Tr. at 118.) *Page 6 
 {¶ 17} Anwar testified that the man who hit him with the bar "had big hair." (Tr. at 118.) Anwar also testified that he was able to see the shooters' faces, and he stated that the shooters came to the Two Friends store every day. Anwar also testified to the following:
 Q. * * * [W]ere you able to pick out the two people that shot you from [the photo arrays]?
 THE INTERPRETER: Definitely. I know them. I recognize them. They are sitting here.
 Q. Are they in pictures in [the photo arrays]?
 THE INTERPRETER: Yes.
 Q. Did you put marks on there and tell the detective you saw them?
 THE INTERPRETER: Yes, definitely[.]
 Q. When you picked out their pictures, were you sure those were the two men that shot you?
 THE INTERPRETER: Yes, definitely. They were coming to my store for four or five months.
 Q. Do you see them in the courtroom here today?
 THE INTERPRETER: Yes. They both are sitting here.
 Q. Can you point to them, please?
 THE INTERPRETER: They are sitting in the middle.
 THE COURT: The record should so reflect that the witness has identified the two defendants.
(Tr. at 134-136.) *Page 7 
 {¶ 18} On cross-examination, Anwar denied telling police after the shooting incident that "the guy with big hair," i.e., B.H., shot him. (Tr. at 161.) Anwar also denied telling Officer Polta that the individual who shot him was the one who previously broke his truck window, i.e., B.H.
 {¶ 19} Detective Siniff also testified as follows on behalf of appellee. On April 12, 2006, Detective Siniff interviewed Anwar at police headquarters about the April 7, 2006 shooting. Anwar's nephew accompanied the victim. Detective Siniff obtained an interpreter from an interpreter service. She did not want to use Anwar's nephew as an interpreter, because she wanted "somebody neutral to be involved in that interview and not someone related to him." (Tr. at 277.) Detective Siniff ultimately obtained a translator for Anwar, and the parties communicated with each other via cell phone. Through the translator, Anwar identified appellant and Burney in the photo arrays. Anwar did not have any difficulty in identifying appellant or Burney from the photo array.
 {¶ 20} On cross-examination, Detective Siniff testified as follows:
 Q [Appellant's trial counsel]. Do you remember [there] being two different versions of who shot Mr. Anwar?
 [A.] Officer Polta handed me the report. I glanced over it, yes. * * *
 Q. Did you ever talk to Officer Polta about the discrepancy in his report?
 A. No. *Page 8 
 Q. But if there was one, you would have wanted to talk to him about any such discrepancy?
 A. Once Mr. Anwar had made his * * * positive ID, I was not concerned with those. * * * [A] lot of times descriptions get confused, they get relayed wrong.
 Q. So, you weren't concerned?
 A. Not at that time, no.
(Tr. at 324-325.)
 {¶ 21} Detective Siniff also testified on cross-examination that she did not ask Anwar about weather conditions, his stress level, the lighting, the length of the incident, how long he viewed the shooters or whether his attention was diverted. Detective Siniff did acknowledge, however, that such factors were important.
 {¶ 22} Appellee then played for the jury the video-recorded interview between Detective Siniff and Anwar. Again, the recording depicted Anwar identifying in the photo arrays Burney and appellant as the individuals who shot him on April 7, 2006. The identification included Anwar's verbal verifications and Anwar physically pointing out appellant and Burney from the photo array.
 {¶ 23} Thereafter, appellee indicated that it was finished presenting evidence, but before appellee formally rested its case-in-chief, appellant's counsel asserted the following:
 * * * [I]t has come to our attention this morning that there has been a DVD of an interview of [appellant] that was taken when he was arrested. At the time this case was going through the discovery process, we were aware of a summary statement from Detective Siniff that indicated that [appellant] had told detectives he had been at the business earlier, but knew nothing of the shooting incident. And there was nothing more about that interview. *Page 9 
 Yesterday, I believe, I was provided a summary of Detective Dorn's actual interview. And it is a rather lengthy summary. However, in it again [appellant] puts himself at the store earlier, but indicates that he did not return to the store. And that neither [B.H.] or [Burney] or [appellant] returned to the store after that incident.
 Now, this morning there is a DVD in which [appellant] states that he and [Burney] were together all night. That [B.H.] was there.
 Your Honor, we are going to make a motion in limine that any mention of this interview with [appellant] be excluded from evidence, first of all, for discovery reasons. I believe we were given it yesterday for the first time. I don't think there is any bad faith or bad doing on [appellee's] part. It is indicated on the front page of the discovery that it was available. However, we were not privy to it until yesterday. We viewed it this morning once.
 That, perhaps, would have changed the whole dynamic of our defense, and certainly some of the theories of our defense, had we known about it earlier.
 Secondly, your Honor, it is my understanding that [appellee] is going to use this statement that [appellant] made to Detective Dorn to try and impeach an alibi witness that is going to be called on behalf of Mr. Burney.
 * * * I don't see any way in Bruton that the court can allow that to happen. * * *
(Tr. at 344-346.)
 {¶ 24} Appellee responded:
 Discovery was requested. My policy is to have my internist copy everything in the file and provide it to defense counsel.* * *
 * * * *Page 10 
 * * * [W]e list Leslie Burney and [appellant]. We referenced their interviews. And it says clearly on page 2 of that, the very last sentence, please see attached DVD of the defendant's interview.
 Then I reviewed that and signed that, and these interviews are now on DVD. * * * We have our interns copy and provide them with discovery * * *.
 * * *
 Now, I know things get missed sometimes. But certainly if you don't have a copy of your defendant's statement on the DVD, which we told them about on May 23rd, and we indicated we gave it to them on May 23rd, it is clearly in there. They are on notice it is there.
 If they did not receive a copy, all they need to do is either make a phone call to me or make a motion with the court.
 The first time I was aware that they had not actually ever received the DVD of either defendant's interview was yesterday around noon.
 * * *
 I have reviewed that DVD. And I do intend to use it to cross-examine Tiffany Davis * * *.
 * * *
 We put them on notice when we provided discovery that there was a DVD out here by saying: Please see attached DVD. If they didn't see it, they could have done something about it four months ago.
(Tr. at 347-349.)
 {¶ 25} The trial court suggested that it could declare a mistrial, and appellant's counsel then argued:
 Judge, my concern is that [appellant's] theory of defense, if this video is permitted into court, has entirely changed. * * * *Page 11 
Essentially, you are going to have [appellant] up there testifying in front of this jury.
 * * *
 I don't think that the mere presence of this DVD creates any problem. I think the problem is created when it is potentially going to be used to impeach someone or introduced as evidence. It is our position that [appellant] is not going to testify. So, in that situation, if this video is introduced or mentioned, then, yes, it would change our theory of defense, and we would ask the court for a mistrial.
(Tr. at 350-351.)
 {¶ 26} The trial court then recessed to allow the co-defendants to talk with their respective counsel. Afterwards, the trial court readjourned. Burney's counsel stated: "We have discussed the potential mistrial with our clients. We have discussed the upside and downside to that motion, and we have been instructed not to request a mistrial at this time." (Tr. at 354.)
 {¶ 27} The trial court concluded that appellee could use appellant's pre-trial statements to impeach Burney's alibi. The trial court explained: "[T]here was sufficient notice to defense counsel that they could have been aware and could have raised the issue of the inadvertently, nonprovided DVD, and they failed to do that." (Tr. at 354.) Appellant's counsel objected to the trial court's ruling.
 {¶ 28} Appellee then formally rested its case-in-chief, and Burney's counsel called Tiffany Davis to testify. Davis testified as follows. Burney and Davis had been dating, and Burney is the father of Davis' child. Davis sees appellant and Burney every day. *Page 12 
 {¶ 29} On April 7, 2006, Davis was visiting her aunt. She received a phone call indicating that Burney was "in the back of a police car" at the Two Friends store. (Tr. at 360.) Davis went to see Burney and arrived at the Two Friends store around 4:30 p.m. At that time, Burney was leaving. However, appellant was present, and Davis stayed at the store with appellant.
 {¶ 30} Thereafter, Davis and appellant went to Burney's house, and they arrived at Burney's mother's house around 6:30 p.m. At that time, Burney was leaving with his mother to go to a restaurant. However, Davis and appellant went in the house and visited with Burney's grandmother.
 {¶ 31} Burney and his mother returned at 7:30 p.m. Davis, Burney, and appellant then socialized. At one point, B.H. was present, but was mostly "in and out of the house." (Tr. at 364.) Appellant and Davis left around 11:00 p.m.
 {¶ 32} Next, Davis testified as follows:
 Q [Burney's counsel]. Did [Burney] or [appellant] ever leave the house to the best of your knowledge?
 A. No.
(Tr. at 364.)
 {¶ 33} On cross-examination, Davis testified as follows. B.H. and Burney are half-siblings in that they have the same mother, but different fathers. Burney and appellant are cousins. Burney and appellant are "always together." (Tr. at 368.) B.H. "hung out with [Burney and appellant] a lot," but "[n]ot all the time." (Tr. at 368.)
 {¶ 34} B.H. was at the Two Friends store when Davis arrived to see what was going on with Burney. Davis also testified on cross-examination that, to her knowledge, *Page 13 
appellant was with Burney at the Two Friends store when Burney had an altercation with a store clerk during the day on April 7, 2006, i.e., the incident that led the police to temporarily place Burney in a police cruiser.
 {¶ 35} Next, Davis testified as follows on cross-examination:
 Q. If [appellant] said [Burney's] baby's mom, who was pregnant, she was in the store when [Burney] got into it with the store clerk, that wouldn't be true?
 A. No.
 Q. If [appellant] made a statement saying that, in fact, himself, [Burney] and [B.H.] were together the rest of that evening until 11:00 * * *, that wouldn't be true?
 A. No.
 Q. You can't alibi for [B.H.] now, can you?
 A. No.
 Q. Even though [appellant], if he made a statement saying he was with [B.H.] that whole night with [Burney] and you, that wouldn't be true?
 A. No.
(Tr. at 370-371, 373.)
 {¶ 36} On re-cross examination, Davis testified as follows:
 Q. These brothers and cousins were all there at the first incident. You testified that if you saw [Burney], you saw [appellant]. They were shadows. It is your testimony *Page 14 
[appellant] and [Burney] were with you, but [B.H.] just took off at some point.
 A. Yes.
(Tr. at 387.)
 {¶ 37} On further cross-examination, Davis testified as follows:
 Q. [B.H.] was not with you the whole night?
 A. No.
 Q. Was [appellant]?
 A. Yes.
 Q. If [appellant] had said that [B.H.] was with him, that's true?
 A. Yes.
 Q. Just not the whole night?
 A. No.
(Tr. at 389-390.)
 {¶ 38} Neither appellant nor co-defendant Burney presented any further witnesses. On rebuttal, appellee re-called Columbus Police Detective Timothy Dorn to testify. Appellee reiterated that it called Detective Dorn to testify in order to impeach Davis' testimony. Both counsel for appellant and Burney objected. The trial court overruled the objections and allowed the testimony.
 {¶ 39} Detective Dorn then testified as follows. Detective Dorn interviewed appellant after police arrested appellant in relation to the April 6, 2007 shooting. Appellant waived his rights under Miranda v.Arizona (1966), 384 U.S. 436, and agreed to talk with the detective. During Detective Dorn's testimony, appellee played parts of *Page 15 
appellant's video-recorded interview, and the recording was admitted into evidence as Exhibit 30. Again, appellant's counsel and Burney's counsel objected to appellee showing appellant's video-recorded interview, but the trial court overruled the objections.
 {¶ 40} The recording depicted the following. Detective Dorn informed appellant of his rights pursuant to Miranda. These rights include the right to remain silent and the right to an attorney. Appellant indicated that he understood his Miranda rights, and appellant expressly waived those rights verbally and by signing a waiver form. Appellant then answered Detective Dorn's questions. Appellant denied his or Burney's involvement in the April 7, 2006 shooting incident. Appellant also stated that he had no issues with any employee at the Two Friends store. However, appellant indicated that Burney was involved in an earlier altercation with a store clerk at the Two Friends store after the clerk accused Burney of trying to grab money from the cash register. In that altercation, the store clerk and Burney fought each other with bats. In the recording, appellant also refers to a "baby's momma" who was in the store at the time of that first altercation. (Appellee's Exhibit 30, interview of appellant, recorded at 17:55:11-14.) Appellant then states the following in the recording. When police arrived in response to the first altercation, individuals with Burney explained to police that Burney was not trying to take money from the cash register. After the first altercation with the store clerk, appellant and Burney went to Burney's house. Eventually, B.H. also came to the house, and B.H. remained at the house for some time. (Appellee's Exhibit 30, interview of appellant, recorded at 17:57:19-33.) Appellant provided no indication in the recording that B.H. was going in and out of the house throughout the evening. *Page 16 
 {¶ 41} Afterwards, the parties made closing arguments. During appellee's closing argument, it referred to Exhibit 30 as follows:
 And [Davis'] testimony is refuted by that tape you just saw.
 * * *
 Look at State's Exhibit 30, and [appellant's] statement regarding the baby's momma being in the store with him.
 * * *
 About that prior incident, there is no doubt Leslie Burney was the one that was in there earlier, and [appellant] puts himself in there. * * *
 I don't have to prove motive to you * * *. What more motive could there be?
 This clerk called the police on all of them. Listen to State's 30. It happened.
 * * * And motive goes to what is going on in their minds.
 Why would they do this to this man?
 Because he had the nerve to call the police on them. He had the nerve to try and defend his business and his property.
(Tr. at 431-433.) Appellant's counsel and Burney's counsel argued separately during closing arguments that their clients were not involved in the shooting incident.
 {¶ 42} Ultimately, the jury found appellant and Burney not guilty of attempted murder, but guilty of felonious assault with the firearm specification. The jury also found appellant guilty of having a weapon while under disability. The trial court sentenced appellant and Burney accordingly. *Page 17 
 {¶ 43} Appellant appeals, raising two assignments of error:
 Error No. I: The trial Court erred in not declaring a mistrial of the joint trials of defendant-appellant and his co-defendant, Leslie Burney, upon learning the State intended to use in-custodial statements of non-testifying defendant-appellant, to discredit co-defendant's alibi witness.
 Error No. 2: Defendant-appellant's counsel was constitutionally ineffective as follows:
 1. In the pre-trial motion to suppress identification hearing, counsel failed to object to "triple-hearsay" testimony, emanating from victim, in a foreign language, to Detective, Ronda Siniff, by the detective's use of an un-sworn and anonymous interpreter; regarding any alleged out-of-court "identification" of defendant-appellant.
 2. Counsel failed to timely move in writing, for a separate trial to the court, of defendant-appellant's additional charge in the indictment, to wit: "Having Weapon While Under Disability."
 3. After receiving from the State, in discovery, notice of DVDs of the defendant-appellant's and co-defendant's in-custodial statements, counsel failed to obtain or view the DVDs, or to move for severance of defendant-appellant's trial from co-defendant's, before trial's commencement; and failed to move for a mistrial after learning
the State intended to use defendant-appellant's statement against co-defendant.
 {¶ 44} Initially, we note that appellants violated Loc.R. 7(E) of the Tenth District Court of Appeals by failing to attach to their brief appendix a copy of the judgment entry from which they are appealing. Generally, Loc.R. 9(E) of the Tenth District Court of Appeals allows us to dismiss an appeal when an appellant has failed to comply with the rules of this court. However, in the interest of justice, we will entertain appellants' appeal notwithstanding their non-compliance with Loc.R. 7(E). *Page 18 
 {¶ 45} In his first assignment of error, appellant argues that the trial court erred in not declaring sua sponte a mistrial of the joint trials of appellant and Burney after appellee revealed that it intended to use the recorded pre-trial interview between Detective Dorn and appellant. We disagree.
 {¶ 46} A trial court is given "great deference" to utilize its discretion to sua sponte declare a mistrial. State v. Glover (1988),35 Ohio St.3d 18, 19. An abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219.
 {¶ 47} Under certain circumstances, a trial court has authority to declare sua sponte a mistrial without a defendant's request or consent. See State v. Morgan (1998), 129 Ohio App.3d 838, 841. In considering the trial court's discretion to declare, or not to declare, sua sponte, a mistrial, we consider whether "`(1) there [was] a "manifest necessity" or a "high degree" of necessity for ordering a mistrial, or (2) "the ends of public justice would otherwise be defeated." `"Glover at 19. See, also, State v. Franklin (1991), 62 Ohio St.3d 118, 127 (holding that a mistrial should be declared "only when the ends of justice so require and a fair trial is no longer possible").
 {¶ 48} Appellant first argues that the trial court needed to declare sua sponte a mistrial because the admission into evidence of the recorded pre-trial interview between Detective Dorn and appellant implicated Bruton v. United States (1968), 391 U.S. 123. In that case, Bruton and a co-defendant were tried for armed robbery in a joint trial. Bruton's co-defendant made an out-of-court statement indicating Bruton's involvement in the crime. The out-of-court statement was admitted into evidence at the joint trial. *Page 20 
Because the co-defendant did not testify, Bruton could not attack that statement by cross-examination. Recognizing that the co-defendant's statement was inevitably suspect because of the motivation to shift the blame to Bruton, and that it was "devastating" to Bruton's defense, the United States Supreme Court held that Bruton's inability to attack the statement violated Bruton's rights under the Confrontation Clause of theSixth Amendment to the United States Constitution. Bruton at 124, 135-137. See, also, State v. Moritz (1980), 63 Ohio St.2d 150, paragraph one of the syllabus, following Bruton (recognizing that "[a]n accused's right of cross-examination secured by the confrontation clause of theSixth Amendment is violated in a joint trial with a non-testifying codefendant by the admission of extrajudicial statements made by the codefendant inculpating the accused").
 {¶ 49} Here, it was the out-of-court statement of appellant himself, and not appellant's co-defendant, that appellee used at trial. InState v. Hardison, Summit App. No. 23050, 2007-Ohio-366, at ¶ 14-16, the Ninth District Court of Appeals found Bruton inapplicable to out-of-court statements made by the appellant himself and to out-of-court statements that the appellant accepted as his own. Thus, like Hardison, we find Bruton inapplicable to appellant.
 {¶ 50} To the extent that appellant argues that his case implicatesBruton principles, we reject such a contention. Bruton is based on confrontation clause concerns. See Bruton at 135-137; Moritz at paragraph one of the syllabus. A defendant cannot raise confrontation clause issues under circumstances where, as here, a defendant's own out-of-court statements are used at trial. See Hardison at ¶ 16;State v. Lloyd, Montgomery App. No. 20220, 2004-Ohio-5813, at ¶ 16; see, also, State *Page 20 v. Rivera-Carrillo, Butler App. No. CA2001-03-054, 2002-Ohio-1013, citing United States v. Namezian (C.A.9, 1991), 948 F.2d 522, 526
(noting that a defendant "cannot claim that he was denied the opportunity to confront himself").
 {¶ 51} In addition, appellant argues that the trial court needed to declare sua sponte a mistrial because the admission into evidence of the recorded pre-trial interview between Detective Dorn and appellant implicated State v. Rosen (1949), 151 Ohio St. 339. In Rosen, the Ohio Supreme Court held in its syllabus:
 Where it is disclosed, preceding the trial of codefendants jointly charged with the commissions of a felony, that a signed confession by one of the defendants, made in the absence of his codefendants, will be put in evidence, which confession contains statements showing the guilt of a codefendant, and based thereon an application for separate trial is duly made by that codefendant, it is the duty of the trial court either to grant the application or to order the prejudicial matter withheld or deleted before admitting the confession in evidence.
 {¶ 52} Like Bruton, Rosen applies to the prosecution using at a joint trial a co-defendant's statement that implicates another defendant. Again, here, appellant does not take issue with a co-defendant's out-of-court statement, but his own out-of-court statement being used at the joint trial. Thus, we find Rosen inapplicable to appellant.
 {¶ 53} To the extent that appellant is arguing the application ofBruton and Rosen on behalf of his co-defendant, Burney, we also deem such an argument inapposite to appellant's appeal. To obtain appellate relief, a defendant must demonstrate that he is the aggrieved party.State v. Zerla, Franklin App. No. 04AP-1087, 2005-Ohio-5077, at ¶ 5-7. Thus, appellant has no standing to seek appellate relief for errors that allegedly impacted his co-defendant. *Page 21 
 {¶ 54} Next, appellant states, without elaboration, that the use of his recorded statement at trial violated his Fifth Amendment right against self-incrimination. However, the use of the statement did not violate appellant's Fifth Amendment right against self-incrimination because appellant expressly, knowingly, and intelligently waived such a right as to the statement when he provided it to Detective Dorn. SeeMiranda at 475.
 {¶ 55} Lastly, appellant states, without elaboration, that his recorded statement constituted inadmissible hearsay. Hearsay is inadmissible "except as otherwise provided." Evid.R. 802. Again, the statement is appellant's own statement, and, as demonstrated in appellee's closing argument, appellee ultimately utilized the statement, in part, against appellant as evidence of his motive to be involved in the shooting incident. Motive is generally relevant in all criminal trials, even though the prosecution need not prove motive in order to secure a conviction. State v. Curry (1975), 43 Ohio St.2d 66, 70-71. Thus, appellee used appellant's statement against him, pursuant to Evid.R. 801(D)(2), an admission of a party opponent. As stated in the hearsay rule itself, statements, such as appellant's, admitted under Evid.R. 801(D)(2) do not constitute hearsay. Thus, we reject appellant's contention that his recorded statement constituted inadmissible hearsay.
 {¶ 56} For these reasons, we conclude that appellant has failed to establish that the trial court abused its discretion in not sua sponte declaring a mistrial. Accordingly, we overrule appellant's first assignment of error.
 {¶ 57} In his second assignment of error, Appellant claims that his counsel rendered ineffective assistance. We disagree. *Page 22 
 {¶ 58} The United States Supreme Court established a two-pronged test for ineffective assistance of counsel. Strickland v. Washington (1984),466 U.S. 668. First, the defendant must show that counsel's performance was outside the range of professionally competent assistance and, therefore, deficient. Id. at 687. Second, the defendant must show that counsel's deficient performance prejudiced the defense and deprived the defendant of a fair trial. Id. A defendant establishes prejudice if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.
 {¶ 59} A properly licensed attorney is presumed competent. State v.Samatar, 152 Ohio App.3d 311, 2003-Ohio-1639, at ¶ 88, citing Vaughn v.Maxwell (1965), 2 Ohio St.2d 299, 301. Moreover, there is "`a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" State v. Bradley (1989),42 Ohio St.3d 136, 142, quoting Strickland at 689. In matters regarding trial strategy, we will generally defer to defense counsel's judgment.State v. Carter, 72 Ohio St.3d 545, 558, 1995-Ohio-104; see, also,State v. Carpenter (1996), 116 Ohio App.3d 615, 626, citingBradley at 144 (holding that we are to "presume that a broad range of choices, perhaps even disastrous ones, are made on the basis of tactical decisions and do not constitute ineffective assistance"). We will only reverse on trial strategy grounds if defense counsel's trial strategy deviated from the standard of reasonableness. State v. Burgins (1988),44 Ohio App.3d 158, 160; State v. Newsome, Ashtabula App. No. 2003-A-0076, 2005-Ohio-3775, at ¶ 8. *Page 23 
 {¶ 60} Appellant first claims that his counsel was ineffective for not raising a hearsay objection in regards to testimony on how Anwar, via an interpreter, identified appellant in a photo array in a pre-trial identification proceeding. At the suppression hearing and at trial, Anwar and Detective Siniff testified about Anwar's out-of-court pre-trial identification of appellant. In addition, the trial court admitted the video recording of Detective Siniff's interview of Anwar, and the video contained Anwar's pre-trial out-of-court identification of appellant as one of the individuals who shot him on April 7, 2006.
 {¶ 61} Initially, we note that, generally, the Rules of Evidence, which include the hearsay rules, do not apply to suppression hearings. See State v. Boczar, 113 Ohio St.3d 148, 2007-Ohio-1251, at ¶ 17; Evid.R. 104(A). Therefore, a trial court may rely on hearsay at suppression hearings. Maumee v. Weisner, 87 Ohio St.3d 295, 298,1999-Ohio-68; United States v. Raddatz (1980), 447 U.S. 667, 679;State v. Sutton, Franklin App. No. 06AP-708, 2007-Ohio-3792, at ¶ 44. Accordingly, appellant's counsel was not ineffective for not raising a hearsay objection at the suppression hearing in regards to Anwar and Detective Siniff's testimonies on Anwar's photo array identification. See Strickland at 687.
 {¶ 62} We next address whether appellant's counsel was ineffective for failing to raise hearsay objections concerning: (1) Anwar and Detective Siniff's trial testimonies about Anwar identifying appellant in a photo array via an interpreter; and (2) the trial court admitting into evidence the video that showed Anwar identifying appellant as one of the shooters.
 {¶ 63} Again, hearsay is inadmissible "except as otherwise provided." Evid.R. 802. Hearsay is a "statement, other than one made by the declarant while testifying at *Page 24 
the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). A victim's pre-trial, out-of-court identification of a perpetrator, both through verbal statements and those aspects of the identification made only through gestures, gives rise to hearsay issues because, overall, the victim has made an out-of-court assertion identifying the perpetrator. See State v.Nevins, 171 Ohio App.3d 97, 2007-Ohio-1511, at ¶ 26-27.
 {¶ 64} In this regard, we must first address any hearsay issues from Detective Siniff and the video-recorded interview conveying at trial Anwar's out-of-court pre-trial identification of appellant. Likewise, we must address any hearsay issues from Anwar testifying at trial about his out-of-court pre-trial identification of appellant. See State v.Rees (Nov. 27, 1989), Gallia App. No. 88 CA 17 (recognizing that an out-of-court statement does not avoid hearsay-related issues merely because the declarant becomes a witness at trial and testifies about the out-of-court statement).
 {¶ 65} Thus, we next address whether Anwar's communication with Detective Siniff via an interpreter, itself, implicated hearsay concerns. In Rivera-Carillo, the Twelfth District Court of Appeals considered whether hearsay principles precluded testimony concerning statements of an individual via an interpreter. The appellate court concluded that the use of an interpreter does not trigger hearsay concerns under certain circumstances. The appellate court noted that "federal courts have held that except in unusual circumstances, an interpreter is no more than a `language conduit' and therefore the interpreter's translation is not inadmissible hearsay." Id., citingUnited States v. Koskerides (C.A.2, 1989), 877 F.2d 1129. *Page 25 
 {¶ 66} The Rivera-Carillo court found no hearsay concerns in the particular circumstances of that case upon recognizing that the interpreter "had no role other than translating statements * * * and was clearly viewed as an interpreter by all parties during the * * * interrogation." The court also considered that the interpreter "translated * * * statements concurrently as made" and that "[t]here is nothing in the record to suggest [the interpreter] had any motive to mislead or distort, and there is no indication that [the] translation was inaccurate."
 {¶ 67} As in Rivera-Carillo, the interpreter here was merely a "language conduit" between Anwar and Detective Siniff. As the video-recorded interview demonstrates, both Detective Siniff and Anwar understood that the interpreter's role was limited to translating. The interpreter translated Anwar's statements concurrently. While appellant complains about Detective Siniff not disclosing the interpreter's name, we find such information irrelevant, given that appellant points to no inaccuracies in the interpreter's translation and no motive to distort the translation. In fact, even though Anwar's nephew was available to act as an interpreter, Detective Siniff used a translation service because she wanted a neutral interpreter. Accordingly, we conclude that Anwar's communication via an interpreter, did not implicate hearsay concerns. Thus, we hold that appellant's counsel was not ineffective for not raising such an issue. See Strickland at 687.
 {¶ 68} Next, we consider whether Anwar's identification of appellant in the photo array, as conveyed at trial by Detective Siniff, Anwar, and the video-recorded identification interview, constituted inadmissible hearsay. Under the applicable version of Evid.R. 801(D)(1)(c): *Page 26 
 (D) Statements which are not hearsay. A statement is not hearsay if:
 (1) Prior statement by witness. The declarant testifies at trial or hearing and is subject to cross-examination concerning the statement, and the statement is * * * (c) one of identification of a person soon after perceiving the person, if the circumstances demonstrate the reliability of the prior identification.
 {¶ 69} Here, Anwar testified and was subject to cross-examination on his pre-trial identification of appellant. As to whether Anwar made the identification "soon after perceiving" appellant, we note that "soon after perceiving" has been defined as the time between the pre-trial identification procedure and the point when the witness makes the statement of identification. See State v. Turvey (1992),84 Ohio App.3d 724, 743. The facts of appellant's case fit under this definition, given that Anwar identified appellant "soon after perceiving" him in a photo array. Id. Alternatively, "soon after perceiving" has been considered as the time between the initial perception at the crime and the identification. See State v. Anderson, 154 Ohio App.3d 789,2003-Ohio-5439, at ¶ 75. The facts of appellant's case also fit under this definition, given that Anwar identified appellant within a week of the shooting incident. See Anderson at ¶ 75 (concluding that a victim identified a perpetrator "soon after perceiving" him, given that the incident occurred on November 8, 1998, and the victim identified the perpetrator on November 12, 1998).
 {¶ 70} We next consider whether the "circumstances demonstrate the reliability of the prior identification," pursuant to Evid.R. 801(D)(1)(c). Reliability factors include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of *Page 27 
certainty demonstrated at the confrontation, and the time between the crime and the confrontation." See Manson v. Brathwaite (1977),432 U.S. 98, 114.
 {¶ 71} Here, in accordance with Manson, we find Anwar's pre-trial identification of appellant in the photo array to be reliable. Anwar identified appellant in the photo array less than one week after the shooting incident. Additionally, we find it significant that Anwar was familiar with appellant after having previously seen him at the Two Friends store. See State v. Barnett (1990), 67 Ohio App.3d 760, 768
(holding that "[o]ne of the strongest of these external factors which may be used to prove the accuracy of the identification is the situation where the witness already knew the perpetrator before the crime was committed"). We acknowledge that Detective Siniff did not ascertain the environmental factors of the shooting incident when she had Anwar identify the shooters, and she did not ascertain any physical or psychological limitations upon Anwar. Nevertheless, Anwar testified at trial that he was able to see the individuals who shot him, and Anwar testified that he was certain about his identification.
 {¶ 72} We recognize Officer Polta's statement that Anwar initially identified B.H. as the individual who shot him. However, such a discrepancy does not negate the reliability of Anwar ultimately identifying appellant in a photo array as a shooter during the April 7, 2006 incident. Officer Polta acknowledged the language barrier he had with Anwar, and he acknowledged that his interview with Anwar was very brief and not the sole focus of his presence at the scene.
 {¶ 73} For these reasons, pursuant to Evid.R. 801(D)(1)(c), we conclude that Anwar's pre-trial identification of appellant in the photo array did not constitute inadmissible hearsay. Therefore, appellant's counsel was not ineffective for not raising *Page 28 
hearsay issues in regards to the pre-trial identification as conveyed by Detective Siniff and Anwar at trial and as conveyed in the video recording. See Strickland at 687.
 {¶ 74} Appellant further argues that his counsel was ineffective for not trying the weapons under disability charge to the trial court. R.C.2923.13 defines "having weapons while under disability," and states, in pertinent part:
 (A) Unless relieved from disability as provided in section 2923.14 of the Revised Code, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:
 (3) The person is under indictment for or has been convicted of any offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been an offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse.
Appellant claims that counsel's "refusal of an opportunity to try this count separately to the court, out of the knowledge of the jury, created an `indisputable inference' (in the collective minds of the jury), that defendant-appellant `already had a gun on his person,' when Mr. Anwar was shot."
 {¶ 75} We reject appellant's contention that trying the weapons under disability charge to the jury created an "indisputable inference" that appellant "already had a gun on his person." The weapons under disability charge was not akin to a stipulation that appellant had a firearm during the shooting incident; rather, as the trial court instructed the jury, appellee had the burden to establish each element of the weapons under *Page 29 
disability charge, including the firearm possession element, by proof beyond a reasonable doubt. See R.C. 2901.05; In re Winship (1970),397 U.S. 358, 364.
 {¶ 76} Instead, we classify as trial strategy appellant's counsel's ultimate decision to try the weapons under disability charge to the jury. See State v. Hanks (Oct. 31, 2000), Franklin App. No. 99AP-1289. Appellant may have concluded that the chance of an acquittal or hung jury on the charge was greater by trying the charge to a jury rather than to a judge. See State v. Love, Ross App. No. 05CA2838,2006-Ohio-1824, at ¶ 49. We acknowledge that appellant's counsel mentioned a desire to try the charge to the trial court when appellee reminded counsel that the jury would hear about appellant's prior juvenile adjudication if the charge is tried to the jury. Yet, in the end, appellant took time to consider the issue, consulted with his client, and then decided to try the weapons under disability charge to the jury. Such circumstances signify trial strategy.
 {¶ 77} A recognized concern with trying a weapons under a disability charge to the jury is that, in a case where a defendant does not testify, the jury would learn about a defendant's prior conviction for the sole reason that the charge was tried before them and not a judge. See Love at ¶ 49 (stating that "[i]t would have been preferable for the jury not to learn of [the defendant's] previous conviction"). However, such reasoning does not compel an automatic finding of ineffective assistance of counsel. See Love at ¶ 49; Hanks. As an example, inHanks, we did not find ineffective assistance of counsel from a counsel's decision to try a weapons under disability charge to a jury because "there is nothing in the record to indicate that the jury convicted appellant because it" learned about a defendant's prior conviction. Rather, we concluded that "the record establishes that the jury was not informed of the details of the offense * * * *Page 30 
Furthermore, * * * the jury's verdict is supported by competent, credible evidence and does not appear tainted from its knowledge of appellant's prior conviction."
 {¶ 78} Here, like in Hanks, there is nothing in the record to indicate that the jury convicted appellant because it learned about appellant's prior juvenile adjudication. Rather, like Hanks, the jury did not learn the details of appellant's prior juvenile adjudication. Given such a factor, and in light of the evidence submitted by appellee on all of the charges, including Anwar's identification of appellant as a shooter, we cannot find that counsel's decision to try the weapons under disability charge unduly prejudiced appellant and rose to the level of ineffective assistance of counsel. See Hanks; Strickland at 694.
 {¶ 79} Lastly, appellant contends that his counsel rendered ineffective assistance by not obtaining and viewing before trial the video of appellant's recorded interview with Detective Dorn. Although appellant's counsel claimed at trial that he did not learn about the video until the middle of the trial, appellee countered that it informed appellant about the video during pre-trial discovery. Appellant now argues that had his counsel obtained and viewed the video during pre-trial discovery, appellant's counsel would have moved to sever the trials of appellant and Burney.
 {¶ 80} According to Crim.R. 14:
 If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment, information, or complaint, or by such joinder for trial together of indictments, informations or complaints, the court shall order an election or separate trial of counts, grant a severance of defendants, or provide such other relief as justice requires. * * * *Page 31 
 {¶ 81} Appellant first contends that he was prejudiced by appellant's counsel's failure to sever the trials between appellant and Burney because appellee's use of the video at trial implicated Bruton. However, as noted above, we found Bruton inapplicable to appellant.
 {¶ 82} Appellant also argues that a severance was necessary because he and Burney had inconsistent defenses due to appellee playing the recorded video. However, we fail to see how appellant can complain about an inconsistent defense between Burney and appellant arising from appellant's own pre-trial statements. Appellant cannot complain that the video conflicted with his alibi defense because appellant did not present an alibi defense at trial, and appellant provided no indication that he was precluded from doing so because of the video. SeeZerla at ¶ 5-7 (stating that, to obtain appellate relief, a defendant must demonstrate that he is the aggrieved party). Overall, the video did not change the ultimate defense of appellant and Burney that they were not involved in the shooting.
 {¶ 83} Furthermore, appellant argues that he was put in a position where his decision not to testify at the trial, as allowed under theFifth Amendment right against self-incrimination, prejudiced him "by virtue of [his] `failure to explain himself to the jury" after appellee used his recorded statement at trial. However, we reject such contentions, noting that the trial court instructed the jury that "[t]he fact that a defendant does not testify must not be considered for any purpose." (Tr. at 407.) We presume that jurors follow the trial court's instructions. State v. Noling, 98 Ohio St.3d 44, 2002-Ohio-7044, at ¶ 39. *Page 32 
 {¶ 84} Appellant speculates that the proceedings would have been different had appellant been tried separately from Burney. Specifically, appellant speculates that appellee would not have used the recording against appellant had appellant been tried separately from Burney. However, speculation does not support a finding of ineffective assistance of counsel. State v. Heffernan, Clermont App. No. CA2005-11-104, 2006-Ohio-5659, at ¶ 16. Moreover, appellee did not just use appellant's recorded statement to impeach Burney's alibi, but also used the statement against appellant as evidence of his motive to be involved in the shooting incident. In this respect, the statement is admissible under Evid.R. 801(D)(2) as an admission of a party opponent, and the statement is admissible under Evid.R. 404(B), which allows "[e]vidence of the other crimes, wrongs, or acts" to be admissible "as proof of motive."
 {¶ 85} We also find unpersuasive appellant's argument that his decision on whether to testify at trial would have been more adequately considered had his counsel viewed the recorded video during the pre-trial discovery process. Appellant's counsel reviewed the video before appellee formally rested its case-in-chief, therefore, appellant was able to take into account the contents of the recording in deciding whether or not to testify.
 {¶ 86} Appellant also criticizes his counsel's decision to withdraw his request for a mistrial. However, we concluded above that a mistrial was not warranted based on the reasons appellant asserted in his first assignment of error.
 {¶ 87} Lastly, we recognize that appellant's counsel contended at trial that his late discovery of the recorded interview changed the theory of his defense. Appellant's counsel seemed to suggest at trial that he crafted a defense under the thought that: (1) *Page 33 
appellant would not testify; and (2) appellant had no pre-trial statements that would be admitted into evidence.
 {¶ 88} A defense attorney "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland at 691. Likewise, a defense attorney has a duty to investigate the facts pertinent to the charges against one's client. State v. Hoop, Brown App. No. CA2004-02-003,2005-Ohio-1407, at ¶ 30. Nevertheless, here, appellant's counsel did not reveal how he would have defended appellant's case differently had he reviewed the recorded interview before trial, and we note that appellant's counsel acknowledged that, during the pre-trial discovery stage, he read a short summary of appellant's pre-trial statements. In this regard, we can only speculate that appellant's counsel's defense theory was prejudiced by his failure to review appellant's recorded statement during the pre-trial discovery stage, and, again, speculation does not support a finding of ineffective assistance of counsel.Heffernan at ¶ 16.
 {¶ 89} In so concluding, we find this case distinguishable fromState v. Biggers (1997), 118 Ohio App.3d 788, 790-791, where we presumed prejudice by a defense counsel's failure to prepare for trial. InBiggers, the record established that the defense counsel "had done little or nothing in the four months during which he had been assigned to the case." Id. at 791. Likewise, at the start of trial, the defense counsel asked for a continuance because he "admitted unequivocally that he was not prepared to go to trial." Id. at 790.
 {¶ 90} Here, unlike Biggers, the record does not establish that appellant's counsel "had done little or nothing" while assigned to appellant's case. Likewise, *Page 34 
appellant's counsel never "admitted unequivocally that he was not prepared" to continue with the trial after learning about the recording of appellant's interview with Detective Dorn. In so recognizing, we note that appellant's counsel eventually decided to continue with the trial and withdraw the mistrial motion, and, in doing so, appellant's counsel did not even ask for a continuance instead of continuing with the trial. In addition, as noted above, appellant's counsel's failure to review the recorded interview is somewhat mitigated by his acknowledgment that, during the pre-trial discovery process, he reviewed a summary of appellant's pre-trial statements.
 {¶ 91} For these reasons, we conclude that appellant's counsel did not render ineffective assistance. Accordingly, we overrule appellant's second assignment of error.
 {¶ 92} In summary, we overrule appellant's first and second assignments of error. Therefore, we affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
McGRATH and WHITESIDE, JJ., concur.
WHITESIDE, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution. *Page 1