[Cite as *State v. Jones*, 2011-Ohio-5966.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | Appellate Case No. 24409 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case No. 10-CR-1122 |
| v. | : | |
| | : | (Criminal Appeal from |
| ROBERT L. JONES | : | Common Pleas Court) |
| | : | |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

O P I N I O N

Rendered on the 18th day of November, 2011.

. . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Atty. Reg. #0069384,
Montgomery County Prosecutor's Office, Appellate Division, Montgomery County
Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
        Attorneys for Plaintiff-Appellee

J. ALLEN WILMES, Atty. Reg. #0012093, 4428 North Dixie Drive, Dayton, Ohio
45414
        Attorney for Defendant-Appellant

. . . . . . . . .

HALL, J.

{¶ 1} Appellant Robert Jones claims that defense counsel provided ineffective

assistance by failing to try a charge of having weapons while under disability to the

court, failing to object during closing-argument to the prosecutor's appeal to the jury's

prejudice and sympathy, failing to object to certain questions the prosecutor asked

his alibi witness, and failing to move to suppress his self identification to police. Jones also claims that the jury's verdict is contrary to the manifest weight of the evidence. We conclude that neither claim has merit and affirm.

I

{¶ 2} On April 4, 2010, Willie Hicks was robbed and kidnapped at gun-point from his Dayton home. When Hicks walked up to the door of his apartment building, in the early morning hours, a man with a bandana covering his mouth ran up behind him and pressed a gun to the back of Hicks's head. When the two went inside the building, Hicks saw another man wearing a ski mask. The three men entered Hicks's apartment, and the two assailants ransacked the premises, taking money and objects. They repeatedly demanded Hicks's drugs and money. The assailants then forced Hicks outside and into the backseat of his car, where they told him to lay face down. The two assailants got in the front, and they drove to a desolate area nearby. A third person followed in another car.

{¶ 3} Hicks owned a truck, which he kept at a storage facility in Drexel, Ohio (just outside Dayton). The assailants demanded to know where the truck was. Hicks lied and told them it was parked inside a Dayton storage facility on Third Street. At that facility, the assailants could not open the locked gate.  Hicks told them that the access code was written on a slip of paper that was either in his car or back at his apartment. After the assailants ransacked Hicks's car looking for the paper, they locked Hicks in the trunk while two of them went back to search his apartment. When the two returned without finding the paper, Hicks heard one of them say, "'I been [sic]

locked up.' * * * 'I just got out. You know I got out from doing seven years, so I know what I'm doing.'" (Tr. 143). He then heard the same one say, "'He playing [sic] too much. Let's kill him.'" (Tr. 144). The trunk opened and Hicks saw the man wearing the bandana pointing a gun at him. Hicks quickly agreed to take the men to the place he stored the money, his cousin's house. Hicks was lying again.

{¶ 4} They all piled into Hicks's car with Hicks in the driver's seat and the bandana wearing man in the passenger seat pressing the gun into Hicks's ribs. While he was driving, Hicks told the man that riding in the car with his face half covered was a sure way to get stopped by the police. The man pulled the bandana down. Hicks did not recognize the man at the time, but later learned that his name was Robert Jones.

{¶ 5} When they arrived at Hicks's cousin's house, Hicks told Jones that he needed a phone to call his cousin to let him know he was outside. Jones gave Hicks his cell phone. Hicks told his cousin, Pete Smith, that he needed the keys to the safe. Smith, of course, had no idea what Hicks was talking about. After Smith hung up, he checked the monitors connected to the security-system cameras installed on his house. Smith saw Jones pull his bandana back up and then push Hicks toward the house with a gun pressed into his back. Smith's wife called the police. When a police cruiser pulled up, Jones bolted. Hicks still had Jones's cell phone.

{¶ 6} The next day, Hicks began his own investigation. He obtained the cell phone number using the caller-ID feature on Smith's home phone. Hicks used the number to obtain from the service provider the name on the service account, which was Jones's. Remembering what he overheard Jones say, Hicks then searched an

online database of offenders, available on the Ohio Department of Rehabilitation and Corrections's website. He immediately recognized the photo of the fourth offender listed. Hicks printed out the photo and gave it to police, telling them that it was the man they were looking for.

{¶ 7} The police department's own investigation corroborated Hicks's findings. Police confirmed that the cell phone was Jones's and that Jones had been convicted for aggravated robbery, felonious assault, and kidnaping. Police also found one of Jones's palm prints and one of his fingerprints on the trunk of Hicks's car.

{¶ 8} Jones was arrested and charged with aggravated robbery, kidnaping, having weapons while under disability, and aggravated burglary. A jury found Jones guilty of each offense. Jones appealed.

## II

{¶ 9} Jones presents two assignments of error for our review. The first claims that defense counsel rendered Jones ineffective assistance. The second claims that the weight of the evidence is against the jury's verdict.

### A. The Ineffective Assistance of Counsel Claim

{¶ 10} When considering a defendant's claim that counsel rendered him ineffective assistance, "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Strickland v. Washington* (1984), 466 U.S. 668, 696, 104 S.Ct. 2052, 80 L.Ed.2d 674. The defendant establishes fundamental unfairness with an ineffectiveness claim when he shows both that counsel performed deficiently and that the deficient performance

prejudiced the defense. Id. at 688 and 693; accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 142. To show deficient performance, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." Id. A reviewing court presumes that counsel's conduct constituted sound trial strategy, a presumption that the defendant must overcome. Id. at 689. To show the requisite prejudice, "the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Bradley*, at paragraph three of the syllabus. "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland*, at 700. Jones contends that counsel's cumulative failures denied him a fair trial. He points to four specific failures.

{¶ 11} Jones first points to counsel's failure to try the weapons-under-a-disability charge separately to the court. As a consequence, says Jones, the jury learned of his prior convictions. It is "[a] recognized concern with trying a weapons under a disability charge to the jury [] that, in a case where a defendant does not testify, the jury would learn about a defendant's prior conviction for the sole reason that the charge was tried before them and not a judge." *State v. Ingram*, Franklin App. No. 06AP-984, 2007-Ohio-7136, at ¶77 (Citation omitted.). Nevertheless, trying the charge to a jury when the defendant does not testify is not per se unreasonable. Id. Courts classify the decision as one of trial strategy. See *Ingram*, at ¶76; *State v. Hill*, Fairfield App. No. 98CA67, 2002-Ohio-227 (responding to the defendant's argument that trial counsel should have tried a weapons-under-disability charge to the trial court, the court said that it "must accord

deference to defense counsel's strategic choices made during trial"). One court has recognized that trying the charge to a jury may be a reasonable strategy in light of the fact that "the chance of an acquittal, or even a hung jury, is considerably greater when charges are tried to a jury, rather than a judge." *State v. Love*, Ross App. No. 05CA2838, 2006-Ohio-1824, at ¶49.

{¶ 12} Jones does not point to anything in the record suggesting that counsel's decision to try the weapons-under-disability charge to the jury in this case was unreasonable. We also note that in the unique facts of this case the victim testified that the defendant said he had just gotten out after serving seven years, and the victim also confirmed Jones's identity from a picture on an Ohio Offenders website. From these two pieces of information it would have been apparent to the jury that the defendant had a criminal record. Considering all these factors, Jones has failed to overcome the presumption that counsel's strategy was sound, and he has failed to demonstrate how the result would have been different if the weapons under disability charge was tried to the court.

{¶ 13} The next two alleged failures by counsel are failures to object to alleged misconduct by the prosecutor during her closing argument and during her cross examination of his alibi witness. But, Jones fails to show a reasonable probability that counsel's objecting to the comment would have changed the outcome of the trial. We address the alibi witness questioning first.

{¶ 14} Jones contends that counsel should have objected to two questions that the prosecutor asked his alibi witness, who was also Jones's girlfriend. Jones asserts that the prosecutor's intent was to imply his guilt by suggesting that there

was enough evidence to keep him in jail while the case against him was pending. To place the questions in the proper context, we first quote the line of questioning leading up to them:

{¶ 15} "Q* * * On that Easter weekend you said that Robert came over Friday night with you and he stayed with you Saturday.

{¶ 16} "A     Yes, ma'am.

{¶ 17} "Q     And then he left at about 1:00 on Sunday?

{¶ 18} "A     Yes, ma'am.

{¶ 19} "Q     Did you ever–when you talked to Mr. Sampson from the Public Defender's office did you write out a written statement for him?

{¶ 20} "A     Yes, ma'am.

{¶ 21} "Q     And in that written statement you say that you all left that day on Saturday and then came home later that night?

{¶ 22} "A     No, ma'am.

{¶ 23} "Q     You didn't write that?

{¶ 24} "A     No, ma'am.

{¶ 25} "Q     That 'I, Keisha Ashby, live at 2030 Cornell Ridge. On Saturday, April the 3rd, about 10:20 Robert L. Jones returned home about 12:00 midnight'?

{¶ 26} "A     Yes, ma'am.

{¶ 27} "Q     That did happen? He did leave your house?

{¶ 28} "A     He didn't leave Saturday.

{¶ 29} "Q     He didn't leave Saturday?

{¶ 30} "A     No, ma'am." (Tr. 488-489).

{¶ 31} Defense counsel then requests a sidebar where he explains that the likely source of confusion is a misreading of the witness's written statement. On resuming cross examination, the prosecutor continues with a new question:

{¶ 32} "Q　　All right. You said that Robert never left on Saturday?

{¶ 33} "A　　Yes.

{¶ 34} "Q　　Okay. But I think in your written statement you–do you remember writing the statement?

{¶ 35} "A　　Yes, ma'am.

{¶ 36} "Q　　Okay. In the statement it says, 'On Saturday, April 3rd, 2010, at about * * * 10:30 p.m., Robert L. Jones returned home."

{¶ 37} "A　　Yes, ma'am.

{¶ 38} "Q　　Okay. Do you remember writing that?

{¶ 39} "A　　Yes, ma'am.

{¶ 40} "Q　　Okay. 'And then at about 12:00 midnight my boyfriend Robert and I, Keisha, went to bed.'

{¶ 41} "A　　Yes, ma'am.

{¶ 42} "Q　　'And we woke up on Sunday.'

{¶ 43} "A　　Yes, ma'am.

{¶ 44} "Q　　Do you remember writing that?

{¶ 45} "A　　Yes, ma'am.

{¶ 46} "Q　　So he didn't leave Saturday?

{¶ 47} "A　　No." (Tr. 490-491).

{¶ 48} The prosecutor then asks if it was possible that Jones, without her

knowledge, left while they were sleeping. Ashby responds that it was not possible. The prosecutor then begins the line of questioning that contains the two questions at issue here, italicized:

{¶ 49} "Q    Okay. Now, you are still currently Robert's girlfriend right now?

{¶ 50} "A    Yes, ma'am.

{¶ 51} "Q    Okay. *And have you seen him since he's been incarcerated on this charge?*

{¶ 52} "A    Yes, ma'am.

{¶ 53} "Q    And have you talked to him on the telephone?

{¶ 54} "A    Yes, ma'am.

{¶ 55} "Q    All right. Have you talked about this case?

{¶ 56} "A    Kind of.

{¶ 57} "Q    Kind of?

{¶ 58} "A    Yes, ma'am.

{¶ 59} "Q    So he know that you were going to come in here and testify in this particular case in front of this jury?

{¶ 60} "A    Yes, ma'am.

{¶ 61} "Q    Okay. Would you ever say anything to help him if he was in trouble?

{¶ 62} "A    No, ma'am.

{¶ 63} "Q    You wouldn't try to help him if he was in trouble?

{¶ 64} "A    No.

{¶ 65} "Q    Okay. *Do you want to see him get out of jail at this point?*

{¶ 66} "A      Yes, ma'am." (Emphasis added.) (Tr. 491-492).

{¶ 67} The prosecutor immediately resumes asking Ashby about Jones's whereabouts Saturday evening and Sunday morning:

{¶ 68} "Q      You said that you had talked to Detective Richey the night of that preliminary hearing. He came out and talked to you?

{¶ 69} "A      Yes, ma'am.

{¶ 70} "Q      And he asked you some questions about what was going on?

{¶ 71} "A      Yes, ma'am.

{¶ 72} "Q      Did you tell Detective Richey when you met with him that Robert was with you all day on Easter Sunday?

{¶ 73} "A      No, ma'am.

{¶ 74} "Q      What did you tell Detective Richey?

{¶ 75} "A      He was there the morning of Easter.

{¶ 76} "Q      The morning of Easter?

{¶ 77} "A      Yes, ma'am.

{¶ 78} "Q      Did he ever ask you about the Saturday night?

{¶ 79} "A      No, ma'am.

{¶ 80} "Q      He didn't ask you about that?

{¶ 81} "A      Huh-uh.

{¶ 82} "Q      Did you tell Detective Richey that–even though he didn't ask you about Saturday night, did you say, 'He was with me all night Saturday night and never left'?

{¶ 83} "A      No, ma'am." (Tr. 492-493).

**{¶ 84}** The State contends that the purpose of the two questions was to show that Ashby's trial testimony about Jones's whereabouts appears inconsistent because she was trying to help her boyfriend. We agree that, given the context, this purpose more likely prompted the two questions. Moreover the jury heard that the defendant had been arrested when the alibi witness, later in her testimony, volunteered that the defendant had been arrested. (Tr. 495) But the questions could have been better worded to avoid any implication that the defendant was in custody. The prosecutor was allowed to attack Asby's credibility, trying to impeach her, by asking her questions that reveal a motive to misrepresent. See Evid.R. 607(A) (providing that "[t]he credibility of a witness may be attacked") and Evid.R. 615(A) (providing that "[b]ias, prejudice, interest, or any motive to misrepresent may be shown to impeach the witness * * * by examination of the witness"). The fact that the witness communicated with the defendant, specifically about the case, subsequent to the initiation of (as opposed to "incarcerated for") the charges, is inquiry relating to the credibility of the witness. The fact that the witness would like to help the defendant be acquitted (as opposed to "get out of jail") is inquiry into the witness' bias. Therefore, if counsel had objected, it is debatable whether, in the sound discretion of the trial court, the objections would have been sustained.

**{¶ 85}** More importantly, assuming the questions were improper, counsel's decision against making an objection would not be per se unreasonable. "The failure to object to error, alone, is not enough to sustain a claim of ineffectiveness. 'Because "[o]bjections tend to disrupt the flow of a trial, [and] are considered technical and bothersome by the fact-finder," competent counsel may reasonably hesitate to object

in the jury's presence.'" *State v. Hartman* (2001), 93 Ohio St.3d 274, 296, quoting *State v. Campbell* (1994), 69 Ohio St.3d 38, 53 (Internal citation omitted.). Jones does not say what made counsel's decision in this case unreasonable, so its reasonableness is presumed.

{¶ 86} The second act of alleged prosecutorial misconduct occurred during the prosecutor's closing argument to the jury. Jones contends that counsel should have objected to that part of the closing argument that appealed to the prejudice and sympathy of the jury. "[T]he test regarding prosecutorial misconduct in closing arguments is 'whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant.'" *State v. Hessler*, 90 Ohio St.3d 108, 125, 2000-Ohio-30, quoting *State v. Smith* (1984), 14 Ohio St.3d 13, 14. "[C]losing remarks must be viewed in their entirety to determine whether the disputed remarks were unfairly prejudicial." *State v. Ross*, Montgomery App. No. 22958, 2010-Ohio-843, at ¶107, citing *State v. Lott* (1990), 51 Ohio St.3d 160, 165. Here, while assembling the evidence supporting the kidnaping charge, the prosecutor recounted Hicks's testimony that Jones put him in the trunk of a car. Then the prosecutor said:

{¶ 87} "Imagine for a second what Willie was going through in the trunk of his car, locked in, and he's already been held at gunpoint and he hears that conversation between the Defendant and the accomplices. 'I know what I'm doing. I just did seven years. I'm going to shoot him. Let's shoot him if he doesn't tell us where everything is at.' And then that trunk lid is lifted with that gun pointed at him." (Tr. 504).

{¶ **88**} The State concedes that the prosecutor's argument here was improper, though the State asserts the problem is that the prosecutor invited the jury to speculate on Hicks's experience and thoughts–facts not in evidence, see *State v. Wogenstahl*, 75 Ohio St.3d 344, 357, 1996-Ohio-219 (referring to the prosecutor's invitation to the jury to concentrate on what the victim experienced and was thinking, and saying that "such argument could be considered error to the extent that it invites the jury to speculate on facts not in evidence"). But in the context of this case and the prosecutor's argument, the error is not as evident as the State concedes. The prosecutor was discussing the kidnaping offense, which charged that the defendant by force, threat or deception removed another or restrained their liberty. A threat that is sufficient to restrain one's liberty necessarily includes how the victim perceives the threat. Thus there is an arguable relationship between the kidnaping charge and the jury's ability to infer that the victim perceived the defendant's words as a threat sufficient to additionally restrain his liberty.

{¶ **89**} Nevertheless, considering that the State concedes the argument was improper, the defendant must show, and we must evaluate, whether that argument prejudiced him. *State v. Smith* (1984), 14 Ohio St.3d 13, 14. "Isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning." *State v. Hill* (1996), 75 Ohio St.3d 195, 204. The defendant must show that absent the comment, the result would have been different. *State v. Loza* (1994), 71 Ohio St.3d 61, 78. Jones asserts that the trial court would have sustained an objection from defense counsel and likely would have given a curative instruction warning the jury against allowing sympathy for the victim or prejudice against Jones

to influence its verdict. But, as the State points out, the trial court did later give such an instruction:

{¶ 90} "* * * You must not be influenced by any considerations of sympathy or prejudice. It's your duty to carefully weigh the evidence, to decide all disputed questions of fact, to apply these instructions of the Court to your fin[d]ings and to render your verdict accordingly.

{¶ 91} "In fulfilling this duty, your efforts must be to arrive at a just verdict. Consider all of the evidence and make your findings with intelligence and impartiality and without bias, sympathy or prejudice so that both the State of Ohio and the Defendant may both know that their case was fairly and impartially tried." (Tr. 542-543).

{¶ 92} "A trial jury is presumed to follow the instructions given to it by the judge." *State v. Henderson* (1988), 39 Ohio St.3d 24, 33, citing *Parker v. Randolph* (1979), 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713. There is no evidence that the jury in this case did not follow the instruction. Therefore, given the context of the argument and the eventual instructions from the court, Jones fails to show prejudice from counsel's decision not to object.

{¶ 93} The last of counsel's alleged failures was the failure to move for suppression of Jones's answers to pre-interview identification questions asking his name, address, date of birth, and social security number.

{¶ 94} Detective C.W. Ritchey testified that Hicks gave him the picture of Jones that Hicks had printed from the Ohio Offender website, telling Ritchey that Jones was the one who robbed him. Ritchey testified that the name on the page with

the picture was Robert L. Jones. Ritchey said that he then applied for an arrest warrant for Jones based on the information given to him by Hicks. The prosecutor was about to show Ritchey his report in order to refresh his memory about the exact date of Jones's arrest when defense counsel objected to Ritchey's identification of Jones. After a brief sidebar, the judge excused the jury from the courtroom and both parties presented their arguments. The prosecutor told the court that she was going to ask Ritchey, first, if the man he met matched the picture that Hicks had given him, and second, whether he asked Jones his name, date of birth, and social security number, which are written on a pre-interview form. The prosecutor said that she was then going to ask about what Ritchey learned of Jones's prior convictions and the name, date of birth, and social security number of the defendant in that case.

{¶ 95} Defense counsel conceded that he did not file a pre-trial motion to suppress Jones's statements to Ritchey. Counsel explained that, during his preparation, he looked for any statements made by Jones that should be suppressed. He continued, "And in particular, I relied upon the following in the police report. Quote upon learning of the arrest of Jones, I made contact with him in an interview room. After going over his rights via the rights form, he declined to speak to me. End of quotation. And I have no other way to establish this except through the representation of counsel but that I do represent that the issue of his not making any statements was in fact covered with the Defendant during trial preparation." (Tr. 357-358). Counsel said that he did not believe a suppression motion was warranted or, at least, it did not appear that one was warranted then. The trial court sustained the objection. None of Jones's statements to Ritchey were admitted.

{¶ 96} While conceding that the objection was sustained, Jones points out that the trial court gave no curative instruction, so the jury was left "to ponder and cumulate the fact that Willie Hicks had located Jones through his prison record and mugshot." Appellant's Brief, p.14. Because counsel did not move to suppress, says Jones, "the jury heard allegations and innuendo against Jones, which it should not have heard." Id.

{¶ 97} We cannot say that counsel acted unreasonably by deciding not to file a pre-trial motion to suppress Jones's statements. Counsel did not appear to be aware of the statements or at least he did not expect the State to use them in the way that it sought to use them at trial. The answers to those same questions would otherwise be admissible, from a proper witness, as routine booking information. *Pennsylvania v. Muniz* (1990), 496 U.S. 582, 601, 110 S.Ct. 2638, 110 L.Ed.2d 528. Regardless, Jones plainly was not prejudiced–the jury heard none of his statements. Defense counsel's trial objection accomplished what a pre-trial suppression motion would not have accomplished.   We note too that the damaging evidence that Jones says counsel should have moved to suppress is not really Ritchey's testimony concerning the detective's conversation with the defendant.   It was Hicks's independent investigation, which Hicks himself testified about anyway, that led Ritchey to the defendant. Finally, Jones does not identify either the allegations or the innuendo that the jury heard because counsel did not move to suppress.

{¶ 98} Jones has not shown that any of counsel's conduct was both deficient and prejudicial.   Therefore his ineffective-assistance claim must be rejected.

{¶ 99} The first assignment of error is overruled.

## B. The Manifest Weight of the Evidence

{¶ 100} In the second assignment of error, Jones argues that all the jury's findings of guilt are contrary to the manifest weight of the evidence. Specifically, Jones contends that the jury should not have believed testimony from Hicks and the police officers because it was inconsistent and conflicting.

{¶ 101} "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them." (Emphasis sic.) *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52 (Citation omitted.). When a verdict is challenged as against the weight of the evidence, the reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id., quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175. Concerning questions of credibility, we have said that, "[b]ecause the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the

testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson* (Aug. 22, 1997), Montgomery App. No. 16288. We have established the rule that "[t]his court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the factfinder lost its way." *State v. Bradley* (Oct. 24, 1997), Champaign App. No. 97 CA 03.

{¶ 102} Jones asserts that Hicks gave conflicting testimony about the condition of his second bedroom. At the preliminary hearing, he testified that his assailants did not search it, but at trial, Hicks testified that they did. Jones also says that Hicks gave conflicting testimony about which assailants had guns. At the preliminary hearing, Hicks testified that only Jones had a gun, but at trial, he testified that one of Jones's accomplices also had a gun. According to Jones, Hicks further gave conflicting testimony about what part of Jones's face the bandana covered. At the preliminary hearing, Hicks said that Jones's bandana covered his nose, but at trial, Hicks testified that the bandana was below his nose. Finally, Jones points to Hick's preliminary-hearing testimony describing Jones's gun as a black 9-millimeter semiautomatic. At trial Hicks described the gun as a silver or chrome revolver.

{¶ 103} Only Hicks's trial testimony was evidence. Hicks's trial testimony itself was not conflicting or inconsistent. Rather, Jones points to instances on cross examination where defense counsel challenged Hicks's credibility with inconsistent preliminary-hearing statements. The jury had to decide the extent to which it would credit Hicks's testimony. It is not patently apparent that the jury lost its way by deciding to believe Hicks's testimony on the critical matters.

{¶ 104} Jones also contends that the police testimony about the prints found on Hicks's car was inconsistent. We disagree.

{¶ 105} John Malott, a police crime-scene investigator, testified that he found prints on Hicks's car's hood, interior door-frame, and trunk. He testified that on the trunk he found a palm print and partial fingerprints. Carl Steele, the Montgomery County Sheriff's Office corrections officer who fingerprints and photographs inmates, explained that AFIS, an automated fingerprint identification system, stores images of fingerprints and palm prints in a database. Steele testified that palm prints are first taken with actual ink and later scanned into AFIS but fingerprints are scanned directly into the system. Steele testified that he fingerprinted Jones this time and when Jones was arrested back in 2000.

{¶ 106} Ronald Swank, a Dayton police officer assigned to the Bureau of Identification, testified as the State's expert in the field of fingerprint and palm print examination and comparison.

{¶ 107} Swank testified that he reviewed the latent print cards that Malott submitted. Swank found that only one fingerprint and two palm prints had any evidentiary value, and he ran them through AFIS. Swank explained that AFIS does not itself make a match. Rather, it returns what it concludes are the best candidates for a match. The user then has to manually compare the candidates to the subject print. Swank testified that on two palm prints and the fingerprint, the number one candidate was Robert Jones. Swank obtained Jones's 2000 fingerprint card and compared the palm and finger prints found on Hicks's trunk to it. He concluded that one palm print was Jones's and that the fingerprint was Jones's too. Another officer

then reviewed Swank's work as part of an established peer-review process.

{¶ 108} We find that the fingerprint testimony is consistent and coherent. We note that, even if we had concluded that the jury should not have credited any of it, Hicks's testimony alone would be enough to support the jury's verdict.

{¶ 109} The second assignment of error is overruled.

{¶ 110} The judgment of the trial court is affirmed.

. . . . . . . . . . . . . .

GRADY, P.J. and DONOVAN, J., concur.


Copies mailed to:

Mathias H. Heck, Jr.
Andrew T. French
J. Allen Wilmes
Hon. Gregory F. Singer