[Cite as *State v. Sanders*, 2016-Ohio-4724.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| *Plaintiff-Appellee* | : | Appellate Case No. 26666 |
| | : | |
| v. | : | Trial Court Case No. 2014-CR-1334 |
| | : | |
| CHARLES L. SANDERS, JR. | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| *Defendant-Appellant* | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 30th day of June, 2016.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by KIRSTEN A. BRANDT, Atty. Reg. No. 0070162, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

J. ALLEN WILMES, Atty. Reg. No. 0012093, 7821 North Dixie Drive, Dayton, Ohio 45414
      Attorney for Defendant-Appellant

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-Appellant, Charles Sanders, appeals from his convictions and sentences on three counts of Murder, two counts of Felonious Assault, and one count of Having a Weapon Under Disability. After Sanders was found guilty of all counts by a jury, the trial court merged counts two through five into count one (Purposeful Murder), and merged the firearm specifications into one count. The total sentence imposed by the court for all convictions was 18 years to life.

{¶ 2} Sanders contends that trial counsel was ineffective by failing to have the Weapons under Disability charge tried to the court rather than the jury and by failing to object to the identification of a State witness as a Drug Enforcement Agent. Sanders also contends that the trial court erred in failing to declare a mistrial after a State witness remarked on Sanders' refusal to talk to police. In addition, Sanders contends that the trial court erred in declaring a State witness a court witness under Evid.R. 614(A), and in admitting hearsay statements as excited utterances. Finally, Sanders contends that his conviction was against the manifest weight of the evidence.

{¶ 3} For the reasons that follow, all of Sanders' assignments of error are without merit. Accordingly, the judgment of the trial court will be affirmed.

I. Facts and Course of Proceedings

{¶ 4} Sanders' murder convictions arose from events that occurred on April 1, 2014, at College Hill Park in Dayton, Ohio. On that day, Charles Sanders was riding around in a black Cadillac with three other people: Robert Long (who was driving), Joshua Hayes, and Gianina Pacheco. Sanders had met Hayes about a year earlier

through Sanders' cousin, who was also Hayes' best friend.

{¶ 5} The group arrived at College Hill Park at around 6:00 p.m. It was Hayes' idea to go to the park, which was located in his neighborhood. Sanders lived in a different neighborhood, but he had been to the park before. When they arrived, between 50 and 100 people, including adults and children, were at the park. The weather was nice, and some people had been playing dice. Others were playing basketball.

{¶ 6} Sanders and Hayes got out of the car and walked up to the basketball court. Long and Pacheco got out and started smoking marijuana. Both Sanders and Hayes knew people at the basketball court, including Jack Parks (nicknamed "J-Money"), and Aaron Smith (nicknamed "Skittles"). Smith was the eventual murder victim. Hayes had known Smith since they were kids, and Sanders had also previously socialized with Smith at Hayes' house. There was no prior animosity between Smith and Sanders.

{¶ 7} At some point after arriving, Sanders began playing one-on-one basketball against Parks, for money. Parks and Sanders had grown up playing youth league basketball together. Before the two men played, Sanders gave his gun to Hayes to hold.

{¶ 8} Sanders testified in his own defense, and stated that before the game, he saw Parks walk over to Smith. Sanders did not see Parks hand anything to Smith, but he subsequently saw Smith place a black semi-automatic gun in a school bag. However, no one else who testified at trial saw Smith or anyone else other than Sanders with a gun that day. Smith's girlfriend, who had lived with him for 12 years, testified that Smith never carried a gun.

{¶ 9} Parks won the game by a score of five or six to zero. Normally, games are played to 12, but if one player reaches six and the other has not scored any points, the

game is over. Hayes and Sanders both testified about a rule that applied to "skunk" situations. Specifically, if a player fails to score, he must pay double. According to Hayes, there was tension after the game because Sanders did not want to pay double. However, Parks and Hayes said that Sanders did not have to pay double, and Parks denied that was a rule.

{¶ 10} In any event, Smith was "trash-talking" and haranguing Sanders during the game. After the game was over, Smith continued to exchange words with Sanders, calling him "broke" and a bum. Things escalated from there, with Smith attempting to start a fight with Sanders. At one point, Hayes attempted to intervene between his two friends by holding Smith back and telling him to leave Sanders alone. After Hayes released Smith, Smith began flinching at Sanders, as if he were going to hit him. According to Hayes, people were laughing, and everyone's attention was centered on the two people fighting. Hayes told Sanders to leave, because he did not want anything to happen to him.

{¶ 11} At that point, Sanders walked over to Hayes, who was standing back by the fence, and said, "I need that." Hayes took this to mean that Sanders needed his gun, and handed the gun to him. Hayes was hoping that Sanders would walk to the car and not do "the unthinkable."

{¶ 12} Sanders testified that he was worried that he was going to get jumped because he was the only one there and the rest of Smith's people were there. He stated that he got his gun back from Hayes, and that Smith was walking back toward his bag. Sanders was walking backwards, looking at Smith. According to Sanders, Smith grabbed a gun and raised it toward his direction. Sanders then shot first. He was not

sure how many times he shot, but stated there was never a time that Smith was not coming at him. Sanders also testified that other people had guns in their hands, and he was sweeping his gun in their direction as he walked back to Long's car.

{¶ 13} Although the park was very crowded that day, police were able to find only two people who admitted to having seen the incident – Hayes and Parks. Hayes testified that after Sanders took the gun, he began walking to the Cadillac. Smith said something else to Sanders, and Sanders turned around and shot him. Hayes did not see the first shot, but heard it. When he turned around, he saw Smith hit the ground. Sanders was still firing at Smith. Hayes then saw Sanders shoot Smith three or four times. He did not see Smith attempt to get back up. Smith was trying to hold on and put his hand on his chest. As Smith was holding his chest, Sanders shot him in the forehead. Hayes testified that he never saw Smith with a gun; the only person he saw that day with a gun was Sanders.

{¶ 14} Parks initially testified that he did not see the gunshots. After being declared a court's witness, he admitted to having made a prior statement to the police about the incident. Previously, Parks told the police that after Sanders obtained a gun from Hayes, he walked up to Smith from behind and bumped him. After walking past Smith, Sanders then turned toward Smith and fired four or five quick shots. Smith then went down on the basketball court, landing on his back. At that point, Sanders looked like he was going to run. However, Sanders then saw Smith attempting to sit up. Sanders walked up to Smith and executed him, firing a shot into his head.

{¶ 15} After the shooting, people ran away from the park. Sanders got into Long's car, and Long drove him home. Hayes ran in the opposite direction from the car, up a

hill, and toward the street. Hayes flagged down a car, which ironically, contained Terry Perdue, an off-duty Dayton Police officer, who happened to be in the area visiting relatives. Perdue had heard shots, and drove towards the park to make sure that the police officers in the area were all right. Perdue parked, and saw at least 50 people in the park. A man (Hayes) then approached his car. Hayes was out of breath, really excited, nervous, and afraid. Hayes told Perdue that "I need to get up out of here. * * * Somebody got shot in the park. My n*** killed somebody in the park, and I need to get up out of here." Transcript of Proceedings, Vol. II, pp. 429-430.

{¶ 16} Eventually, Perdue allowed Hayes to get in the car. Hayes was not aware Perdue was a police officer. Hayes kept telling the same story over and over, and was out of breath, excited, and very nervous. According to Perdue, Hayes said, "his n*** was playing basketball. He lost a game three times and a n*** was talking sh***t the whole time; and after he lost the third game, he grabbed a gun out of his pants, went up to the n***, shot him three times, walked up to him and shot him in his head." *Id.* at p. 432.

{¶ 17} Very shortly thereafter, Hayes received a phone call, and stated, among other things, that "Bro, Chuck done killed a n***. Chuck done shot a n*** over a basketball game. * * *." *Id.* At that point, Perdue decided he needed to have an on-duty officer take Hayes into custody for questioning. Perdue's total encounter with Hayes lasted about three minutes, and he then turned Hayes over to officers at the scene.

{¶ 18} Sanders and Hayes spoke briefly shortly after the shooting. Hayes called Sanders at around 6:47 p.m. According to Hayes, when he asked Sanders why he would do that, Sanders said he had messed up. Sanders never told Hayes that Smith

had drawn a gun on him or that he feared for his life.

{¶ 19} In contrast, Sanders denied saying he had messed up; instead, he told Hayes that it was not supposed to happen like this. According to Sanders, Hayes also said that Sanders had put Hayes in the middle of his friends and they were going to try to do something to Hayes.

{¶ 20} Hayes apparently did not know Sanders' last name; Sanders was listed in his cell phone as "Chuckie." Eventually, at the police station that evening, Sanders' last name was figured out, and Hayes identified a photo of Sanders as the person he knew as Chuck or Chuckie. In the meantime, Sanders had fled the area. In the early morning hours of April 2, 2014, Sanders took a Greyhound bus from Columbus, Ohio, to Nashville, Tennessee, using a ticket purchased in the name of his brother, Kevin Harbut. Sanders stayed in Nashville until he was arrested on June 7, 2014, and extradited to Ohio. The gun was never recovered.

{¶ 21} The police also did not recover any guns from the scene. Officer Bryant, who happened to be near the park investigating a burglary, heard six gunshots. After arriving at the scene shortly thereafter, Bryant assisted in collecting evidence. The police found six spent shell casings at the scene, which were determined to have all come from the same .40 caliber semi-automatic pistol. Bullets found in Smith's body matched each other, and came from a gun consistent with a .40 caliber Smith and Wesson semi-automatic pistol.

{¶ 22} Smith's autopsy revealed that he had been shot six times, once in the back, four times in the chest and abdomen area, and once in the head. Based on the stippling around the head wound, this wound was inflicted from a distance of two feet or less.

Smith died of multiple gunshot wounds, several of which could have been fatal.

{¶ 23} On April 21, 2014, Pacheco identified Sanders from a photospread as the individual who had been with her, Long, and Hayes on the day of the shooting. At trial, Pacheco indicated that she did not see anything at the park because her back was turned. She heard some arguing and gunshots, and then ran away. Long disappeared and his whereabouts were unknown at trial.

{¶ 24} Hayes was in jail for a period of time after speaking with the police on April 1, 2014. During calls to his girlfriend from jail, Hayes indicated that there were people who had guns, and wondered why they did not shoot back at Sanders. Hayes also stated that Sanders was defending himself. However, at trial, Hayes testified that when he made this latter statement, he was mad at both Smith and Sanders. He said he was mad at Smith because he had never acted like that before, but stressed that he did not mean that Sanders had a right to kill Smith. Hayes also repeatedly stressed that he did not see anyone with guns on the day of the murder; his statement about guns simply reflected the fact that everyone in the "hood" has guns, yet no one helped when Sanders gunned down Smith. Instead, everyone but Hayes ran away.

{¶ 25} After Sanders was arrested, he told his family during phone calls from the jail that he did not kill Smith and that he was not present at the murder. During a July 10, 2014 conversation, Sanders told his father: "I didn't do it. Not working on self-defense. Working on I didn't do it." Transcript of Proceedings, Volume IV, p. 727 and State's Ex. 69.

{¶ 26} After hearing the evidence, the jury found Sanders guilty of all charges, and he was sentenced accordingly. Sanders now appeals from his convictions and

sentences.

## II. Ineffective Assistance of Counsel

**{¶ 27}** Sanders' First Assignment of Error states that:

Appellant Received Ineffective Assistance of Counsel Due to Defense Counsel's Failure to Have Count Six (Weapons under Disability) Tried to the Court Instead of the Jury and Failure to Object to Detective Deriggi Identifying Himself as a Drug Enforcement Agent.

**{¶ 28}** Sanders raises two points under this assignment of error. First, he argues that trial counsel was ineffective by failing to have the Weapons under Disability charge tried to the judge rather than the jury. Next, Sanders argues that trial counsel should have asked that the jury be precluded from hearing that Detective Deriggi was involved with the Drug Enforcement Agency, as this permitted an inference that Sanders was involved in drug activity.

**{¶ 29}** "The right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution' to which they are entitled." (Citations omitted.) *Strickland v. Washington*, 466 U.S. 668, 685, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to establish ineffective assistance of counsel, a defendant "must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687.

{¶ 30} "To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." (Citations omitted.) *State v. Bradley*, 42 Ohio St.3d 136, 137, 538 N.E.2d 373 (1989), paragraph three of the syllabus.

{¶ 31} In *State v. Jones*, 2d Dist. Montgomery No. 24409, 2011-Ohio-5966, we observed that " '[a] recognized concern with trying a weapons under a disability charge to the jury * * * [is] that, in a case where a defendant does not testify, the jury would learn about a defendant's prior conviction for the sole reason that the charge was tried before them and not a judge.' " *Id.* at ¶ 11, quoting *State v. Ingram*, 10th Dist. Franklin No. 06AP-984, 2007-Ohio-7136, ¶ 77. We further noted that when a defendant does not testify, the choice is not per se unreasonable, but is classified by courts as a trial strategy decision. (Citations omitted.) *Id.* Thus, in such a situation, the issue would be whether trial counsel's strategy was reasonable.

{¶ 32} The same analysis would not necessarily apply where a defendant chooses to testify. By testifying in his own defense, Sanders was subject to cross-examination about his prior felony convictions. *See* Evid.R. 609(A), and *State v. Wright*, 48 Ohio St.3d 5, 7, 548 N.E.2d 923 (1990) (noting that evidence of an accused's prior convictions may be admitted as bearing on credibility). *See also State v. Lawson*, 2d Dist. Montgomery No. 23456, 2010-Ohio-3114, ¶ 21 (rejecting the defendant's argument that the trial court abused its discretion in admitting evidence about his prior convictions).

{¶ 33} In *Lawson*, the defendant testified as to his version of events surrounding the alleged crime. We noted that while the defendant's "general character was not at

issue, his credibility was. 'When a defendant's version of what occurred contradicts other witnesses, his credibility is at issue and it may be appropriate to impeach the defendant and to test his credibility by introducing testimony regarding his prior convictions.' " *Id.*, quoting *State v. Owings*, 2d Dist. Montgomery No. 21429, 2006-Ohio-4281, ¶ 29. (Other citation omitted.)

{¶ 34} As in *Lawson*, the trial court gave Sanders' jury a limiting instruction, by stating that Sanders' prior convictions were admitted for the limited purpose of assessing his credibility, and could not be considered as character evidence or to indicate that he acted in conformance with such character at the time. *See* Transcript of Proceedings, Vol. IV, pp. 790 and 803-804. Accordingly, we find no deficiency in trial counsel's performance. In this regard, we note that the evidence against Sanders was very strong, and self-defense was likely the only feasible line of defense.

{¶ 35} As an additional matter, Sanders argues that while he decided to testify, his free choice to do so was likely encumbered by his attorney's decision not to waive a jury trial on the weapons charge. However, there is no evidence to this effect, and the course of trial contradicts such an assertion. Specifically, the defense's opening statement indicates that the choice for Sanders to testify had been made prior to trial, as counsel raised Sanders' self-defense during the statement. *See* Transcript of Proceedings, Vol. I, pp. 259-260. Admittedly, Sanders could later have decided not to testify, but that would have contradicted his statement to the jury and would also have eliminated his only potential defense.

{¶ 36} In arguing that failure to request bifurcation was ineffective, Sanders cites *State v. Jenkins*, 8th Dist. Cuyahoga No. 91100, 2009-Ohio-235, which allegedly holds

that failing to bifurcate such a charge "could not conceivably be considered a trial tactic." Appellant's Brief, p. 20, quoting *Jenkins* at ¶ 17. However, Sanders omits the entire quotation from *Jenkins*. Notably, *Jenkins* involved three omissions: failure to file a motion to suppress; failure to file a motion for discovery; and failure to bifurcate the weapons under disability charge. *Id.* at ¶ 1-18. The court of appeals concluded that trial counsel should have filed a motion to suppress, and that any statements made or evidence seized after the police exceeded the scope of a permissible stop must be suppressed. *Id.* at ¶ 14-17.

{¶ 37} After reaching these conclusions about the suppression motion, the court of appeals went on to note that trial counsel had also neglected to file a motion for discovery or a motion to bifurcate the weapons charge. *Id.* at ¶ 17. The court then stated that: *"[a]lthough neither of these omissions alone would constitute ineffective assistance of trial counsel*, together they add to the cumulative nature of counsel's errors, because neither omission can conceivably be considered a trial tactic under the facts and circumstances of this particular case." (Emphasis added.) *Id.*

{¶ 38} As was noted above, failing to bifurcate can be considered a trial tactic even where the defendant decides not to testify. Furthermore, the comment in *Jenkins* was intended to apply to the circumstances of that particular case, which differ from those of the case before us.

{¶ 39} Sanders goes on to state that as in *Jenkins*, the failure to waive a jury trial, coupled with the failure to file a motion in limine about the testimony of a witness, Deriggi, constituted ineffective assistance of counsel. Since we have already concluded that trial counsel did not act ineffectively with respect to wavier of the jury trial, there is nothing to

"couple."

{¶ 40} As was noted, Sanders was arrested in Nashville, Tennessee, in June 2014, and was extradited to Ohio. At trial, the State elicited testimony from Agent Deriggi, who had taken Sanders into custody in Nashville. Before Deriggi testified, the following exchange occurred:

> THE COURT: * * * it's my understanding your next witness is a DEA agent. * * * .
>
> * * *
>
> THE COURT: * * * Agent Deriggi, the only thing I want to say to you is during the course of your testimony, I do not want you in any way to discuss the investigation that you were involved in regarding Mr. Sanders.
>
> The purpose of your testimony in this trial is simply that your contact with him in, [sic] I believe it was Nashville, Tennessee. And but you are not in any way to talk about the investigation that you are conducting for the DEA regarding Mr. Sanders and others that was occurring in Nashville.
>
> Mr. DERIGGI: Absolutely, Your Honor.

Transcript of Proceedings, Vol. III, pp. 596-597.

{¶ 41} After the court's admonition, the State called "Special Agent Frank Deriggi" to the stand. *Id.* at p. 597. The following exchange then occurred:

> Q. And Mr. Deriggi, where are you currently employed?
>
> A. I am currently employed with the City of Mount Juliet Police Department in Tennessee. And I'm assigned as a detective, or task force officer, with the DEA.

Q. And how long have you been with – in this position?

A. I have been with the DEA for almost three years.

Q. Mr. Deriggi, during your duties as a law enforcement officer for the DEA, did you come in contact with the defendant, Charles Sanders?

A. I did.

Q. And did you apprehend this Defendant on a nationwide murder warrant out of Dayton, Ohio?

A. I did.

Transcript of Proceedings, Vol. III, pp. 598-599.

{¶ 42} During the rest of Deriggi's brief testimony, the witness discussed the date of Sander's arrest in Nashville, Tennessee, and a bus ticket found in Sanders' room when he was arrested. The ticket was for a Greyhound bus trip departing from Columbus, Ohio, on April 2, 2014, at 2:15 a.m., and arriving in Nashville, Tennessee at 10:00 a.m., the same day.

{¶ 43} Defense counsel did not object to any of this testimony. Having reviewed the record, we conclude that defense counsel was not deficient in failing to ask the court to preclude any reference to the DEA. Consistent with the court's admonition, the agent did not discuss a DEA investigation of Sanders or others. Instead, Deriggi was asked if he came "into contact" with Sanders during the course of his duties. This contact could have arisen in any number of ways, and need not necessarily have been related to a drug investigation of Sanders or others.

{¶ 44} Moreover, even if trial counsel should have asked for a more restrictive examination, we see no prejudice. The testimony that was given was very limited, and

was intended simply to establish that Sanders was arrested out-of-state and was returned to Ohio. In addition, since Sanders had not yet testified about leaving the state, it was important to establish that Sanders had in his possession a bus ticket issued shortly after the murder, for travel to a location where he was ultimately found, two months after the crime. To this end, the State also presented evidence from Sanders' cell phone provider, showing that his phone was used in Trotwood, Ohio at 7:26 p.m. on the evening of the murder. The phone was then turned off, and was next used at 11:15 p.m. that night. However, the phone was registered as roaming at that time – meaning that the phone was no longer in the Cincinnati network area, which covered limited areas in Southwestern Ohio (including Dayton), Indiana, and Kentucky. The network area did not extend as far East as Columbus, Ohio, nor did it extend to Nashville.

{¶ 45} Finally, as we have said, the evidence against Sanders was overwhelming. Based on the preceding discussion, the First Assignment of Error is overruled.

### III. Alleged Error in Failing to Grant a Mistrial

{¶ 46} Sanders' Second Assignment of Error states that:

The Trial Court Committed Prejudicial Error in Refusing to Declare a Mistrial When a Police Detective Made Reference to Sanders' Refusal to Talk to Him.

{¶ 47} Under this assignment of error, Sanders contends that the trial court should have granted a mistrial when Detective House testified that Sanders refused to speak with him.

{¶ 48} At the time of trial, Detective House had been employed as a Dayton Police

officer for 23 years, and had been a detective for 18 years. He had been assigned to the homicide division for more than two years. House was the lead investigator for the Smith murder. At trial, during House's testimony, the following exchange occurred:

Q. Okay. Detective, after you had got done speaking with Mr. Parks, what was the next thing you did in this investigation?

A. From there, I continued to try to contact different individuals. I learned that Charles had been arrested in Nashville. Charles was extradited back to Dayton. I attempted to interview Mr. Sanders. He did not want to speak to us.

Transcript of Proceedings. Vol. III, p. 626.

{¶ 49} Defense counsel immediately objected, and the trial court sustained the objection. The court also told the jury to disregard the officer's statement. *Id.*

{¶ 50} At a bench conference that followed, the State asked for a curative instruction, and defense counsel moved for a mistrial. The trial court overruled the motion for a mistrial. The court said that while it was troubled by what had occurred, the comment was not sufficiently prejudicial to cause a mistrial. The court went on to give the jury another curative instruction. At this point, the court told the jury to disregard the officer's statement, and stressed that individuals or suspects have no obligation to speak to the police. The court additionally told the jury that Sanders' choice not to speak with the police could not be used against him in any manner. *Id.* at pp. 628-629.

{¶ 51} In arguing that reversal is warranted, Sanders relies on *State v. Leach*, 102 Ohio St.3d 135, 2004-Ohio-2147, 807 N.E.2d 335, in which the Supreme Court of Ohio held that "[u]se of a defendant's pre-arrest silence as substantive evidence of guilt violates

the Fifth Amendment privilege against self-incrimination." *Id.* at syllabus. *Leach* also recognized that post-arrest, post-*Miranda* silence may not be used as substantive evidence of guilt in the State's case, because it violates the fundamental fairness guaranteed by the Due Process Clause. *Id.* at ¶ 17, citing *Wainwright v. Greenfield*, 474 U.S. 284, 291, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986).

{¶ 52} In *Leach*, the court further observed that "when a defendant has already been arrested but has not yet been *Mirandized* and later takes the stand in his own defense, the Fifth Amendment is not violated when the state cross-examines the defendant concerning his post-arrest silence." *Id.* at ¶ 23, citing *Fletcher v. Weir*, 455 U.S. 603, 607, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982). Finally, the court stated that "[h]owever, the United States Supreme Court has not addressed whether post-arrest, pre-*Miranda* silence may be used as *substantive* evidence of guilt in the state's case-in-chief." (Emphasis sic.) *Id.* at ¶ 24.

{¶ 53} In a subsequent case, the Fourth District Court of Appeals considered the issue left unresolved in *Leach*. *See State v. Whitaker*, 4th Dist. Scioto No. 07CA3168, 2008-Ohio-4149. In *Whitaker*, a State witness commented on the defendant's statement that he did not want to incriminate himself. *Id.* at ¶ 26. The defendant also testified in his own defense. *Id.* at ¶ 9-11. The defendant failed to object at trial, which limited the court of appeals to a plain error review. *Id.* at ¶ 27. In considering the issue, the court of appeals observed that:

> Although the Supreme Court of Ohio's decision in *Leach* addressed whether the defendant's pre-arrest and pre-*Miranda* silence could be used substantively against the accused, we believe the court's reasoning applies

even more strongly to a defendant's invocation of his Fifth Amendment rights while in custody but before receiving the *Miranda* warning. "To hold otherwise would encourage improper police tactics, as officers would have reason to delay administering *Miranda* warnings so that they might use the defendant's pre-arrest silence to encourage the jury to infer guilt." *Leach* [,102 Ohio St.3d 135, 2004-Ohio-2147, 807 N.E.2d 335,] at ¶ 31. Furthermore, allowing the State to use defendants' pre-*Miranda* silence against them "would force defendants either to permit the jury to infer guilt from their silence or surrender their right not to testify and take the stand to explain their prior silence." *Id.* Because the substantive use of Whitaker's pre-*Miranda* invocation of his right to silence undermines the very protections that the Fifth Amendment was designed to provide, we hold that substantive use of the defendant's post-arrest, pre-*Miranda* invocation of the right to silence in the prosecution's case-in-chief violates the Fifth Amendment as incorporated by the Fourteenth Amendment.

*Whitaker* at ¶ 32.

**{¶ 54}** The court of appeals went on to find trial counsel ineffective for failing to request a curative instruction. *Id.* at ¶ 35. In addition, the court found the error prejudicial because the evidence against the defendant was not overwhelming. *Id.* at ¶ 37.

**{¶ 55}** Like *Whitaker*, this case involves post-arrest, pre-*Miranda* silence, as there was no indication that *Miranda* warnings had been administered at the time Sanders refused to speak to the police. It also involves a situation of substantive proof, since the

comments occurred during the State's case-in-chief, not during cross-examination. However, even assuming for purposes of argument that Detective House's statement constituted a violation of Sanders' rights, the trial court did not err in refusing to declare a mistrial.

{¶ 56} "The grant or denial of an order of mistrial lies within the sound discretion of the trial court." (Citations omitted.) *State v. Garner*, 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (1995). *Garner* further stressed that "[a] jury is presumed to follow the instructions, including curative instructions, given it by a trial judge. * * * Moreover, mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible." (Citations omitted.) *Id.*

{¶ 57} The State did not elicit Detective House's comment, and the trial court immediately told the jury to disregard the comment. In addition, the trial court gave a further curative instruction to the jury. In *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, the Supreme Court of Ohio concluded that a prosecutor's comment in closing argument about a defendant's pre-arrest silence was analogous to such comments having been made during the State's case-in-chief. *Id.* at ¶ 160. However, the court found the improper comments harmless beyond a reasonable doubt because the trial court immediately sustained a defense objection and ordered the jury to disregard the comments; the comments were "brief and isolated"; and there was overwhelming evidence of the defendant's guilt. *Id.* at ¶ 162.

{¶ 58} The same observations apply here. Detective House's comment was a fleeting and isolated observation that the State did not elicit, and the trial court immediately gave curative instructions to the jury. Furthermore, the evidence of

Sanders' guilt was overwhelming.

{¶ 59} In this regard, we note that *Whitaker* did not involve the presence of a curative instruction or the evidence of overwhelming guilt. *See also State v. Combs*, 62 Ohio St.3d 278, 282, 581 N.E.2d 1071 (1991) (admission of defendant's post-custody, pre-*Miranda* warnings statement, while improper, did not cause a miscarriage of justice); *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 91 (reference to defendant's assertion of right to counsel was improper, but curative instruction prevented any prejudice); and *State v. Marker*, 2d Dist. Greene No. 2014-CA-1, 2014-Ohio-3840, ¶ 21 (defendant's Fifth Amendment rights were violated based on use of his post-arrest silence as substantive evidence of guilt. However, the error was harmless because the outcome of the trial was not affected.)

{¶ 60} In light of the preceding discussion, the Second Assignment of Error is overruled.


IV.   Alleged Violation of Evid.R. 607(A).

{¶ 61} Sanders' Third Assignment of Error states that:

    The Trial Court Committed Prejudicial Error in Permitting the State
    to Cross-Examine Jack Parks in Violation of Evid.R. 607(A).

{¶ 62} Under this assignment of error, Sanders contends that the trial court should not have designated Jack Parks as a court's witness pursuant to Evid.R. 614(A), because there was no showing of surprise under Evid.R. 607(A).

{¶ 63} Parks was the individual who played basketball against Sanders at the park. Parks did not voluntarily come forward, but was located about two months after the

murder, based on Detective House's investigative work. Parks was initially cooperative, picked Sanders out from a photospread on June 2, 2014, and gave House a detailed statement about the murder, including that he (Parks) was a direct eyewitness to the murder. Parks was subpoenaed for trial. However, the State subsequently filed a motion asking the court to designate Parks as its own witness under Evid.R. 614(A).

{¶ 64} This motion was based on the fact that Parks had initially cooperated, but had later failed to either meet with or respond to prosecutors. When Detective House was finally able to make personal contact with Parks on March 10, 2015, Parks had materially varied his account. The State indicated that it was unsure at this point what Parks' testimony would be when called to the stand. Alternatively, the State asked that the court allow it to use leading questions pursuant to Evid.R. 611(C).

{¶ 65} The trial court discussed the motion with the parties on the day that Parks was scheduled to testify. At that time, the court concluded that a ruling would be premature because the court did not know what Parks would say. However, after Parks began testifying, Parks said that he had not seen the murder occur. This was directly contrary to his prior statement. At that point, the parties and court discussed the issue further. *See* Transcript of Proceedings, Vol. II, pp. 354-60. Following the discussion, the court designated Parks as its own witness under Evid.R. 614(A). The court also found surprise.

{¶ 66} After Parks was designated as a court witness, the State questioned Parks about his prior statement to Detective House, in which Parks said that he had seen Sanders get a gun from another individual and then walk up to Smith, bumping Smith. Parks had also told House that Sanders walked past him (Parks), turned toward Smith,

and fired four or five quick shots.  In addition, Parks told House that Smith went down on the court, landing on his back.  At that point, it looked as if Sanders were going to run, but then Sanders saw Smith start to sit back up.  Sanders then walked right up to Smith and executed him, firing one shot into Smith's head.

**{¶ 67}** Evid.R. 607(A) states that:

The credibility of a witness may be attacked by any party except that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage.

**{¶ 68}** Thus, the State would normally not be allowed to impeach its own witness through a prior inconsistent statement unless it could show surprise and affirmative damage.  Sanders contends that the State could not show surprise because it knew before trial that Parks had changed his account.

**{¶ 69}** Evid.R. 614(A) states, however, that "[t]he court may, on its own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called."  This is an exception to Evid.R. 607(A).  *State v. Arnold*, 189 Ohio App.3d 507, 2010-Ohio-5379, 939 N.E.2d 218, ¶ 45 (2d Dist.).  As a result, the State does not have to show surprise.  (Citations omitted.)  *State v. Griffin*, 2d Dist. Montgomery No. 20681, 2005-Ohio-3698, ¶ 37.

**{¶ 70}** Trial courts have authority to call individuals as court witnesses, in the exercise of the court's sound discretion.  *State v. Adams*, 62 Ohio St.2d 151, 404 N.E.2d 144 (1980), paragraph four of the syllabus.  Consequently, we review the trial court's decision for abuse of discretion, which "implies that the court's attitude is unreasonable,

arbitrary or unconscionable." (Citations omitted.) *Id.* at 157.

**{¶ 71}** After reviewing the record, we find no abuse of discretion. The circumstances here are similar to those in *Adams*, in which the State had presented a prima facie case against the defendant when the State asked the court to designate its witness as a court's witness. *Id.* at 158. The witness was also the mother of the child who had been abused in that case, meaning that she had a close connection with the case and was an important witness. *Id.*

**{¶ 72}** In the case before us, Parks was one of two witnesses who admitted to having seen the murder occur. He was also closely involved in the events that led up to the shooting. As a result, "[t]he trial court had before it ample justification for concluding that [Parks'] testimony would be beneficial to the jury in performing its fact-finding responsibilities." *Id.* In addition, Parks was clearly reluctant to testify, after having initially cooperated with the police, and his trial testimony contradicted his earlier statements to the police. The trial court, therefore, did not err in calling Parks as a court witness. *See, e.g.*, *State v. Renner*, 2d Dist. Montgomery No. 25514, 2013-Ohio-5463, ¶ 23-25, and *State v. Slaughter*, 2d Dist. Montgomery No. 25215, 2014-Ohio-862, ¶ 46 (allowing witnesses to be called as court witnesses in these situations).

**{¶ 73}** Based on the preceding discussion, the Third Assignment of Error is overruled.

## V. Admission of Excited Utterances Evidence

**{¶ 74}** Sanders' Fourth Assignment of Error states that:

The Trial Court Committed Prejudicial Error in Permitting Josh

Hayes' Sensational Hearsay Testimony as "Excited Utterances."

{¶ 75} Under this assignment of error, Sanders contends that the trial court erred in admitting statements that Josh Hayes made to off-duty police officer, Terry Perdue, shortly after the murder. The trial court admitted these hearsay statements as excited utterances. At trial Sanders objected to the testimony, arguing that Hayes was overweight and out of breath, rather than being under the stress of the event. Transcript of Proceedings, Vol. II, p. 427. The court overruled the objection and admitted the testimony under Evid.R. 803(2).

{¶ 76} Evid.R. 803(2) allows admission of hearsay statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." "For an excited utterance to be admissible, '[t]he central requirements are that the statement must be made while the declarant is still under the stress of the event and the statement may *not* be a result of reflective thought.' " (Emphasis sic.) *State v. O'Neal*, 87 Ohio St.3d 402, 411, 721 N.E.2d 73 (2000), quoting *State v. Taylor*, 66 Ohio St.3d 295, 303, 612 N.E.2d 316 (1993). In *Taylor*, the court emphasized that "[t]here is no *per se* amount of time after which a statement can no longer be considered to be an excited utterance." (Italics sic.) *Taylor* at 303. " 'Each case must be decided on its own circumstances. * * * ' " *Id.*, quoting *State v. Duncan*, 53 Ohio St.2d 215, 219-220, 373 N.E.2d 1234 (1978). (Other citation omitted.)

{¶ 77} The statements that Hayes made to Perdue unquestionably fit the requirements for excited utterances. Hayes had witnessed a most shocking event – the violent murder of a close friend – just moments earlier. Perdue also described Hayes as having been really excited, nervous, and afraid. He further described Hayes' tone of

voice as "vibrating," "jumpy," and "real nervous." Transcript of Proceedings, Vol. II, pp. 431-432. Moreover, Hayes' comments were obviously not the result of reflective thought. Hayes, himself, stated that he was in shock when he flagged down Perdue. The trial court, therefore, did not err in concluding that Hayes' hearsay statements were excited utterances.

{¶ 78} Sanders additionally objects to admission of the statements because they were vulgar and sensational, and duplicated testimony Hayes had already given. Because no such objections were made at trial, we review them only for plain error. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 119. "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶ 79} Our review of the record indicates that this is not the exceptional case where plain error should be noticed. While some of Hayes' comments were admittedly crude, they do not reflect on Sanders. If anything, they would have caused the jury to think less of Hayes. Furthermore, the testimony was more detailed than what was given by Hayes, and was important because during this conversation, Hayes identified Sanders by name to Perdue. Accordingly, the Fourth Assignment of Error is overruled.

## VI.   Manifest Weight Argument

{¶ 80} Sanders' Fifth Assignment of Error states as follows:

The Trial Court Committed Prejudicial Error by Entering a Finding of

Guilty Which Finding was Contra to the Manifest Weight of the Evidence.

**{¶ 81}** Under this assignment of error, Sanders contends that the jury's verdict was against the weight of the evidence. As support for this proposition, Sanders relies on the fact that Hayes initially lied to police about how Sanders obtained the gun, and on inconsistencies in the testimony of Hayes and Parks, who were the only apparent eye-witnesses to the shooting.[1]

**{¶ 82}** "When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Watson*, 2015-Ohio-4517, 46 N.E.3d 1090, ¶ 21 (2d Dist.), quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). "A judgment should be reversed as being against the manifest weight of the evidence 'only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶ 83}** After reviewing the entire record, we conclude that this case is not the exceptional one in which the evidence weighs heavily against the conviction. As an initial matter, Hayes was not biased against Sanders. Instead, both the victim and Sanders were his friends, and he had no prior animosity towards Sanders. Furthermore, while Hayes was not initially truthful with the police about where Sanders obtained the gun (picking it up from the ground as opposed to obtaining it from Hayes), Hayes explained in

---

[1] We say "apparent," because even though 50 to 100 people were at the park, and even though the police talked to quite a few individuals, no one would admit to having seen anything.

court that he had lied about this because he was afraid he would get in trouble. This was a plausible explanation, and the jury was in the best position to assess the credibility of the respective witnesses. (Citation omitted.) *State v. Mabra*, 2d Dist. Clark No. 2014-CA-147, 2015-Ohio-5493, ¶ 39.

{¶ 84} Hayes also told his girlfriend on the day after the incident that Sanders was defending himself. Again, he explained this statement in court, stating that he was very upset at the time, and was mad at both Sanders and Smith. Hayes stressed repeatedly in testimony that Smith did not have a weapon. Hayes' testimony was also corroborated by the statement he made to Perdue shortly after he was picked up. Again, the jury was in the best position to decide what weight to give the testimony.

{¶ 85} Parks was also a reluctant witness. Although he stated in court that he did not see anything, his prior statement to the police was very consistent with Hayes' testimony. In addition, the physical evidence is consistent with the testimony of Hayes and Parks, and is inconsistent with Sanders' testimony.

{¶ 86} Both Hayes and Parks heard six shots and did not see Smith or anyone else with a weapon. The police did not find any weapons, and found only six shell casings at the scene. Smith had six bullet wounds. The two bullets recovered from Smith's body were both fired from the same weapon, which was consistent with a .40 caliber Smith and Wesson semi-automatic pistol. All the shell casings came from the same type of weapon, i.e., a .40 caliber semi-automatic pistol. The fact that Smith was shot in the back, and that he was also shot at very close range are inconsistent with Sanders' self-defense claim. If Sanders were truly afraid of being shot by Smith, he would not have ventured to within two feet to deliver a shot to the head, particularly when

five prior shots had found their target.

{¶ 87} Furthermore, Sanders' self-defense claims are inconsistent with statements he made to his family while in jail. Sanders told his family that the case was not based on self-defense. Instead, he claimed he was not at the murder scene and had not done anything. At trial, Sanders explained these comments by stating that he was aware the police were recording his calls, and that he wanted his family to discuss his case with his attorney, not with him. However, the jury was entitled to disbelieve this testimony.

{¶ 88} Based on the preceding discussion, Sanders' Fifth Assignment of Error is overruled.


VII. Conclusion

{¶ 89} All of Sanders' assignments of error having been overruled, the judgment of the trial court is affirmed.



. . . . . . . . . . . . .

HALL, J., concurs.

DONOVAN, P.J. concurs in judgment only.



Copies mailed to:

Mathias H. Heck, Jr.
Kirsten A. Brandt

J. Allen Wilmes
Hon. Michael Tucker